# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

KIP LYALL, on behalf of himself and all
others similarly situated,

      Plaintiff,

      v.

ELSEVIER, INC.; RELX PLC; and CELL
PRESS, INC.;

      Defendant.

Civil Action No. 1:24-cv-12022-PBS

## <u>MEMORANDUM OF LAW IN SUPPORT OF<br>DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)</u>

STEPTOE LLP

Alexander Wolf (BBO # 685374)
717 Texas Avenue, Suite 2800
Houston, Texas 77002
(713) 221-2300
awolf@steptoe.com

Nathaniel J. Kritzer (*pro hac* forthcoming)
Joseph Sanderson (*pro hac* forthcoming)
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900
nkritzer@steptoe.com
josanderson@steptoe.com

B. Gammon Fain (*pro hac* forthcoming)
1330 Connecticut Avenue NW
Washington, District of Columbia 20036
(202) 429-3000
gfain@steptoe.com

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ...........................................................................................................1

BACKGROUND .............................................................................................................5

ARGUMENT ..................................................................................................................7

I.      Plaintiff's Baseless Securities Fraud Claim Fails on Every Level. ....................................7

      A.     Plaintiff Fails to Plead a Material Misrepresentation or Omission........................ 8

      B.     The Complaint Is Devoid of Allegations that RELX Intended to Defraud Investors, Let Alone Ones Giving Rise to a Strong Inference of Scienter. .......... 11

      C.     By Plaintiff's Own Admission, He Knew the Truth Before Buying RELX Stock—And Challenges Statements *After* He Bought.......................................... 13

      D.     Plaintiff Does Not Allege Damages or Loss Causation....................................... 14

      E.     Plaintiff Failed to Provide A PSLRA Certification or Advertise for a Lead Plaintiff. ......................................................................................................... 15

II.     Plaintiff'S State and Federal Disabilities Discrimination Claims Are Time-Barred........15

III.    Plaintiff's Attempts to Plead Common Law Exceptions to the At-Will Employment Doctrine Fail. .........................................................................................................18

      A.     No Public Policy Exception to At-Will Employment Applies Here..................... 18

      B.     Unspecified Policies Did Not Estop Defendants from Firing Plaintiff................ 19

CONCLUSION...............................................................................................................20

CERTIFICATE OF SERVICE .......................................................................................21

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abraham v. Woods Hole Oceanographic Inst.*,
553 F.3d 114 (1st Cir. 2009) ....................................................................................4, 16, 17

*Adamczyk v. Augat, Inc.*,
755 N.E.2d 824 (Mass. App. Ct. 2001) .....................................................................4, 16, 17

*Altayyar v. Etsy, Inc.*,
731 F. App'x 35 (2d Cir. 2018) ...........................................................................................11

*AthenaHealth, Inc. v. May*,
290 F. Supp. 3d 108 (D. Mass. 2018) ..................................................................................20

*Backman v. Polaroid Corp.*,
910 F.2d 10 (1st Cir. 1990) (en banc) ..............................................................................9, 10

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ............................................................................................................13

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975) ............................................................................................................13

*Brennan v. Zafgen, Inc.*,
853 F.3d 606 (1st Cir. 2017) .................................................................................................7

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
632 F.3d 751 (1st Cir. 2011) .................................................................................................8

*Coleman v. Cambridge Savings Bank*,
2023 Mass. App. Unpub. LEXIS 402 (Mass. App. Ct. Aug. 17, 2023) ...............................20

*Del. State Coll. v. Ricks*,
449 U.S. 250 (1980) .........................................................................................................4, 16, 17

*Fanucchi v. Enviva Inc.*,
2024 U.S. Dist. LEXIS 117242 (D. Md. July 3, 2024)....................................................10, 11

*Fitzer v. Sec. Dynamics Techs.*,
119 F. Supp. 2d 12 (D. Mass. 2000) ....................................................................................11

*Gertz v. Vantel Int'l/Pearls in the Oyster Inc.*,
2020 U.S. Dist. LEXIS 123473 (D. Mass. July 14, 2020)....................................................11

*Greebel v. FTP Software, Inc.*,
    939 F. Supp. 57 (D. Mass. 1996) ................................................................15

*In re Diebold Nixdorf, Inc. Sec. Litig.*,
    2021 U.S. Dist. LEXIS 62449 (S.D.N.Y. Mar. 30, 2021) ............................11

*In re Salomon Analyst Level 3 Litig.*,
    373 F. Supp. 2d 248 (S.D.N.Y. 2005)..........................................................12

*In re USEC Sec. Litig.*,
    168 F. Supp. 2d 560 (D. Md. 2001)..............................................................15

*Jackvony v. Riht Fin. Corp.*,
    873 F.2d 411 (1st Cir. 1989)........................................................................13

*Karth v. Keryx Biopharmaceuticals, Inc.*,
    334 F.R.D. 7 (D. Mass. 2019) ......................................................................14

*Meehan v. Med. Info. Tech., Inc.*,
    177 N.E.3d 917 (Mass. 2021) .................................................................18, 19

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 S. Ct. 2869 (2010) ....................................................................8

*Quinones v. Frequency Therapeutics, Inc.*,
    106 F.4th 177 (1st Cir. 2024).......................................................................12

*Rhode Island Hosp. Trust Nat'l Bank v. Varadian*,
    647 N.E.2d 1174 (Mass. 1995) .....................................................................20

*Shash v. Biogen, Inc.*,
    84 F.4th 1 (1st Cir. 2023).........................................................................7, 14

*Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*,
    533 N.E.2d 1368 (Mass. 1989) .....................................................................18

*Thant v. Karyopharm Therapeutics Inc.*,
    43 F.4th 214 (1st Cir. 2022)...........................................................................9

*Treadwell v. John Hancock Mut. Life Ins. Co.*,
    666 F. Supp. 278 (D. Mass. 1987) ................................................................20

*Wang Yan v. ReWalk Robotics Ltd.*,
    330 F. Supp. 3d 555 (D. Mass. 2018) ...........................................................14

**Statutes**

15 U.S.C. § 78u-4(a)(2) .......................................................................................8

15 U.S.C. § 78u-4(a)(2)(A)(ii) ........................................................................................................15

15 U.S.C. § 78u-4(a)(2)(A)(vi) .......................................................................................................15

15 U.S.C. § 78u-4(a)(3) ....................................................................................................................8

15 U.S.C. § 78u-4(b)(1) .............................................................................................................8, 10

42 U.S.C. § 2000e-5(e)(1) ..............................................................................................................15

**Other Authorities**

Fed. R. Civ. P. 8 ...............................................................................................................................3

Fed. R. Civ. P. 9(b) ......................................................................................................................3, 7

Fed. R. Civ. P. 10b-5 ...........................................................................................................7, 8, 13

Fed. R. Civ. P. 12(b)(6) .................................................................................................................14

## INTRODUCTION

Defendants Elsevier Inc. ("Elsevier"), RELX PLC ("RELX"), and Cell Press Inc. ("Cell Press") are publishing companies with catalogues that include a wide range of academic journals and related research. Some of the better-known publications of Defendants RELX and Elsevier include *Gray's Anatomy* and *The Lancet*.[1] Defendant Cell Press, a subsidiary of Elsevier, likewise publishes scientific journals such as *Cell*.[2] (Compl. ¶ 6). In all, Defendants publish nearly 3,000 research journals across most scientific fields, including materials relating to alternative, renewable, and clean energy.[3]

In 2022, RELX, the only defendant with publicly traded stock, issued a statement affirming its continued support for a climate pledge. (*Id.* ¶ 10). That statement included a forward-looking aspiration to achieve net-zero carbon emissions by 2050.[4] (*Id.*). RELX's public filings described, in painstaking detail, the steps it would take towards that future goal. These steps included, among others, reducing "Scope 1 and 2 location-based carbon emissions by 74%" from 2010 to 2022, purchasing offsets for Scope 1, Scope 2, and Scope 3[5] emissions, and submitting "a carbon target for verification to the Science Based Targets Initiative."[6]

Plaintiff Kip Lyall does not allege that any of these statements were false, or that any Defendant failed to take the detailed steps described in RELX's filings. Rather, Plaintiff believed

---

[1] *See, e.g.*, https://www.elsevier.com/books-and-journals/book-series/grays-anatomy; https://www.sciencedirect.com/journal/the-lancet. (last accessed Oct. 16, 2024).

[2] *See, e.g.*, https://www.cell.com/about. (last accessed Oct. 16, 2024).

[3] The titles of such journals include, for example, *Renewable Energy*, *Renewable Energy System and Equipment*, and *Renewable and Sustainable Energy Transition*. *See* https://www.elsevier.com/products/journals?query=renewable. (last accessed Oct. 16, 2024).

[4] The Complaint references 2050 as the target date for achieving net zero emissions under the guidelines of UNFCCC, but RELX has set a goal to achieve net zero carbon emissions across all carbon scopes "by 2040 at the latest." *See* Note 6 *infra* and reference therein.

[5] Scope 1 emissions include direct emissions, Scope 2 emissions include indirect emissions, and Scope 3 emissions include business flights. https://www.relx.com/~/media/Files/R/RELX-Group/documents/responsibility/additional-resources/2023/2023-reporting-guidelines-methodology.pdf

[6] RELX 2022 Annual Report at 67 (incorporated at footnote 2 of the Complaint), https://www.sec.gov/Archives/edgar/data/929869/000092986923000067/tmb-20230223xex99d1.pdf.

that, in addition to these steps, Defendants should have (1) ceased publishing any research that could be useful to the fossil fuel industry, (2) caused RELX's political action committee to refuse to donate to politicians who have views that Plaintiff does not share, and (3) refused to "host" unnamed[7] "exhibitions" that "enable participants to grow their businesses and increase fossil fuel production." (*Id.* ¶ 13). Plaintiff publicly demanded that Defendants do these things while he was employed by Cell Press, and he now admits he leaked information to the press to generate articles to pressure them to do so. (*Id.* ¶¶ 67-69). He also claims that Defendants' decision not to accede to his demands amounted to securities fraud. (*Id.* ¶¶ 139-141).

These allegations are factually and legally baseless. Fundamentally, Plaintiff's Complaint seeks to censor the publication of scientific research in areas that could relate to climate change. Critically, Defendants ***never stated they had adopted Plaintiff's views on what energy-related scientific research should and should not be published***. Defendants have deep concern for climate change and take significant environmental protection measures. At the same time, as publishers, Defendants care deeply about the broad sharing of ideas and research, which can be used in any number of ways that a publisher does not, cannot, and should not control. Defendants made no promise, representation, or other assertion that their publications would not be used by any particular industry or member of their broad audience. And indeed, the supposedly damning facts pleaded by Plaintiff—that among the thousands of scientific journals Defendants publish are a handful with titles such as *Petroleum Research*, *Petroleum Exploration and Development*, and the *Journal of Pipeline Science and Engineering*—were publicly known facts, which

---

[7] The only such "exhibition" referenced in the Complaint was a mining and engineering exhibition in Australia, which gives no indication that it was sponsored, let alone "hosted," by any of the Defendants. *See* Compl. n.23, https://www.queenslandminingexpo.com.au/. Nor does Plaintiff allege why a mining exhibition would necessarily "enable" anyone to "increase fossil fuel production" as opposed to, e.g., increase production of metals needed for renewable power infrastructure.

Plaintiff knew with particular intimacy. (*Id.* ¶ 7 & n.10). Knowing all of these facts, he nonetheless decided to buy four shares of RELX in March 2021. (*Id.* ¶¶ 4, 7).

Despite this admitted knowledge, Plaintiff claims he was "defrauded" into buying those shares because he supposedly "paid artificially inflated prices for RELX stock, under the belief that RELX is a company that performs well on ESG and thus better [*sic*] positioned for long term risk and ethically sound investment." (*Id.* ¶ 141). This claim fails on every level under the strict, controlling standards that apply to claims for securities fraud.

Plaintiff does not plead even the first element needed for a securities fraud claim: a materially misleading statement. The premise of Plaintiff's "fraud" theory is that public information like the titles of journals that RELX subsidiaries publish is philosophically inconsistent with fighting climate change. (*E.g.*, *id.* ¶ 7 & n.10). At best, that shows a difference of opinion between Mr. Lyall and company management about what should be done in respect of climate goals.[8] It does not show that RELX (let alone its subsidiaries who do not make public securities filings) made any material misrepresentations or omissions.

Next, Plaintiff makes no effort to plead intent to deceive, let alone plead facts creating the strong inference of scienter that is required under the Private Securities Litigation Reform Act ("PSLRA"). He pleads only generically that "Defendants knew or deliberately disregarded that the statements were misleading." (*Id.* ¶ 140). This type of conclusory allegation would be insufficient even under the "plausibility" standard of Fed. R. Civ. P. 8, let alone the heightened standards of Fed. R. Civ. P. 9(b) and the PSLRA.

---

[8] At worst, it shows a naked effort to censor Defendants from publishing on important topics, simply because Mr. Lyall does not like the name of the publications. Plaintiff does not plead anything about the contents of the relevant journals: whether they include research on issues such as safety, efficiency, carbon capture, or other topics relevant to reducing, not increasing, carbon emissions from the petroleum industry.

Plaintiff's claims also fail basic logic, relying on *2022* statements to claim that the price of the stock was inflated when he bought four shares in *2021*. Nor does Plaintiff claim that RELX's stock dropped upon the revelation of a supposed "fraud." That is because he can't—his claim is based on information that was publicly available at all times, and the value of RELX's stock has only increased since March 2021. Nor has Plaintiff made the required certification under the PSLRA for a securities class action or posted the required notice for the lead plaintiff appointment process. In short, Plaintiff's securities claim is completely baseless and is precisely the type of abuse of private securities claims that the PSLRA bars. It should be dismissed with prejudice.

Plaintiff's statutory employment claims fare no better. Plaintiff alleges that he was told on June 7, 2023, that he was being fired, with his last day being ultimately set at the end of a paid medical leave, which he first requested in the meeting at which he was informed of his termination. He claims that this termination violated the Americans with Disabilities Act and the Massachusetts Fair Employment Practices Act. But Plaintiff did not file an administrative charge within 300 days of being notified of his termination. His claim is thus time-barred. Case after case, from the Supreme Court down, has held that notice of termination, not the last day of work, is when a discrimination claim accrues and the 300-day clock begins to run. *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980); *Adamczyk v. Augat, Inc.*, 755 N.E.2d 824, 828 (Mass. App. Ct. 2001); *Abraham v. Woods Hole Oceanographic Inst.*, 553 F.3d 114, 117 (1st Cir. 2009).

Finally, Plaintiff's common-law claims fail with his other allegations. Massachusetts courts regularly reject attempts (like Plaintiff's) to generate an exception to the employment-at-will doctrine through "public policies" or promissory estoppel, and the Court should do so here.

## **BACKGROUND**

Mr. Lyall is a former employee of Cell Press, a subsidiary of Elsevier, which is the world's largest global publishing house. (Compl. ¶ 2). RELX is a UK public limited company, with its primary listing in London, its secondary listing in Amsterdam, and an American Depositary Receipts facility issued by Citibank that trades in New York. (*Id.* ¶ 2). Plaintiff says he bought "4 shares of RELX stock," which, taken as pleaded, would mean that he bought ordinary shares in London or Amsterdam rather than ADRs in New York. (*Id.* ¶ 4). He says that these purchases occurred on March 8, 2021. (*Id.*).

*Before* those stock purchases, Plaintiff says that in 2020, he "discovered" that RELX was, as he puts it, "actively supporting fossil fuel expansion" while making statements about its climate-consciousness. (*Id.* ¶ 7). That does not mean that RELX had secret oil wells or coal-fired power plants hidden among its printing presses. It means that RELX "publishes journals for oil and gas technology," some of them with editors from the oil-and-gas industry, and that its predecessor's PAC donated to some Republicans between 2014 and 2016. (*Id.* ¶ 12).

Plaintiff complains that RELX has not complied with his public campaign to limit what speech it will publish and what politicians it will support. Specifically, Plaintiff has pressed Defendants to stop providing research services and exhibitions that are "fossil fuel industry-oriented" and to stop "lobbying and supporting US politicians who block climate action." (*Id.* ¶¶ 13, 40). Plaintiff says that in early 2021—that is, before buying the four shares—he did research and concluded that Defendants were "actively and practically in support of companies that exist to profit from the expansion of fossil fuel." (*Id.* ¶ 53).

Immediately after buying his four shares, Plaintiff alleges that he submitted an ethics complaint repeating his accusations that RELX could not claim to be sustainable when its

customers might use information that RELX published in ways that Plaintiff contended were not sustainable. (*Id.* ¶ 54). He says he created an internal group seeking to push RELX to stop publishing information of interest to the oil-and-gas industry and used that group to create reports criticizing RELX. (*Id.* ¶¶ 40-51, 55-59). When he packaged those reports in the form of an "ethics complaint" that he then submitted to RELX's Human Resources department, he was unsatisfied with the company's investigation and response and its admonition that he should refrain from reproducing RELX's copyrighted material in the reports he generated on behalf of his advocacy group. (*Id.* ¶¶ 60-67).

Plaintiff alleges he then spoke to an outside journalist. (*Id.* ¶¶ 68-69). He claims his bosses suspected he was the source and confronted him about leaking and attempted to persuade other members of his internal group to disengage from Plaintiff. (*Id.* ¶¶ 70-71). Plaintiff says his manager confronted him about making other members of the internal group uncomfortable, which he claims was inaccurate. (*Id.* ¶¶ 72-74).

According to Plaintiff, he developed anxiety as a result of these interactions. (*Id.* ¶ 76). He says he complained that his work environment was "psychologically uneasy" but his complaints were dismissed. (*Id.* ¶¶ 77-78). He claims he continued to raise concerns about the company publishing information whose end users included the oil-and-gas industry and that members of his group were told not to use work emails for their advocacy or to send unsolicited emails to coworkers. (*Id.* ¶¶ 79-83). Plaintiff was disciplined for being "argumentative," which he claims was retaliatory. (*Id.* ¶¶ 84-86). He alleges that he requested an accommodation on May 30, 2023, of limiting the length of mandatory meetings to 45 minutes and giving him one business day advance notice of the purpose of meetings. (*Id.* ¶¶ 24, 92).

On June 7, 2023, Plaintiff was given notice he was being terminated. (*Id.* ¶ 95). After being informed of his termination on that date, he requested a paid medical leave, which lasted until August 8, 2023. (*Id.* ¶¶ 96-98). He filed an administrative discrimination charge on June 2, 2024, more than 300 days after he was told he was being fired. (*Id.* ¶ 34). Without waiting for a right-to-sue letter, he then filed suit on August 6, 2024.

## ARGUMENT

## I.     PLAINTIFF'S BASELESS SECURITIES FRAUD CLAIM FAILS ON EVERY LEVEL.

Plaintiff's Complaint attempts to turn a meritless employment case into a securities fraud class action. That is exactly the type of baseless securities claim that led Congress to pass the Private Securities Litigation Reform Act, and the securities claim fails on every level. Plaintiff admits that he had done his "research" and found out the "truth"—that is, that RELX publishes certain journals and scientific and technical information—before buying his four shares. His only allegation of intent to defraud is a single-sentence conclusory allegation. He does not connect any revelation of already-public information he claims contradicts RELX's climate goals to any decline in the price of RELX's stock.

These allegations utterly fail to meet the exacting pleading standards that apply to private claims for securities fraud. Such claims are subject not only to the plausibility standard that applies to any motion to dismiss, but also to the heightened pleading standards of the Private Securities Litigation Reform Act and Federal Rule of Civil Procedure 9(b). *Shash v. Biogen, Inc.*, 84 F.4th 1, 10 (1st Cir. 2023). "[T]o state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Brennan v. Zafgen, Inc.*, 853 F.3d 606, 613 (1st Cir.

2017) (internal quotation marks omitted). The Private Securities Litigation Reform Act requires

that a plaintiff "shall specify each statement alleged to have been misleading, the reason or

reasons why the statement is misleading, and, if an allegation regarding the statement or

omission is made on information and belief, the complaint shall state with particularity all facts

on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Plaintiff "must, with respect to each

alleged act or omission, *state with particularity* facts giving rise to a *strong inference* that the

defendant acted with the required state of mind." *City of Dearborn Heights Act 345 Police &*

*Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 757 (1st Cir. 2011) (emphasis original, quoting 15

U.S.C. § 78u-4(b)(2)). Additionally, where, as here, a plaintiff purports to bring claims on behalf

of a class, the plaintiff must provide a sworn certification, personally signed by the plaintiff,

certifying (among other things) that the plaintiff did not buy the stock in order to sue and will not

accept any payment other than their *pro rata* share of recovery. 15 U.S.C. § 78u-4(a)(2). The

plaintiff must also then publish a notice advising other shareholders of the pendency of the action

and the time to move to serve as lead plaintiff. 15 U.S.C. § 78u-4(a)(3).

Here, the Complaint fails at every turn and must be dismissed.

## A. Plaintiff Fails to Plead a Material Misrepresentation or Omission.

The Complaint does not plead any material misrepresentation or omission, let alone with

the specificity required by the PSLRA.[9] To survive a motion to dismiss, Plaintiff must plead that

RELX affirmatively made statements that would mislead reasonable investors. It is not enough to

---

[9] As a further ground for dismissal, the Complaint does not actually allege a domestic transaction in RELX securities. Because the Exchange Act is not extraterritorial, the failure to allege a transaction in the United States is fatal to a Rule 10b-5 claim. *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 273, 130 S. Ct. 2869, 2888 (2010). Plaintiff alleges he bought four "shares" of RELX. (Compl. ¶¶ 4, 52.) But RELX's shares trade in London and Amsterdam. (Compl. ¶ 3; *supra* Note 6 (2022 Annual Report)). While RELX has an American Depositary Receipts facility in New York, Plaintiff never alleges a transaction in ADRs, only "shares," which would imply that he bought them on the London or Amsterdam stock exchanges. Nor does Plaintiff provide the required PSLRA disclosure of his securities transactions, which might clear up whether he engaged in a domestic transaction. Absent an allegation of a domestic transaction, the securities fraud claims fail at the outset.

plead that RELX spoke about sustainability but did not list a full catalogue of its publications along with those disclosures. As the First Circuit has held, the requirement not to mislead "does not mean that by revealing one fact" on a subject, "one must reveal all others that, too, would be interesting." *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (en banc). Rather, Plaintiff must show that something RELX said would mislead reasonable investors absent disclosure of the (publicly-available) facts he says were not included. *See id.*

At a fundamental level, Plaintiff never pleads that RELX represented to investors that its sustainability measures included considering how readers might use the information it published, commitments not to donate to any particular political campaign, or limits on the types of events it could sponsor or host. Nor does he point to specific factual claims that are false. Rather, his theory is that publicly-available information undermines general statements of RELX's goals and aspirations. (*E.g.*, Compl. ¶ 12). The type of information he cites—titles of publications, research products RELX sells, and politicians to whom its predecessor's PAC donated between 2014 and 2016—are not secret, but rather are available to every investor, including Plaintiff. (*Id.*).

The fact that Plaintiff is relying on publicly-available information to prove "falsity" dooms his case, because reasonable investors are just as capable as Plaintiff himself at assessing whether publishing a scientific journal of interest to the oil-and-gas industry is consistent with a goal to be carbon neutral by 2040—a goal that expressly acknowledges the ongoing need for energy from the oil and gas industry for many years to come.[10] (Compl. ¶ 12 & n.10). "It is not a material omission to fail to point out information of which the market is already aware." *Thant v. Karyopharm Therapeutics Inc.*, 43 F.4th 214, 222 (1st Cir. 2022). Thus, in another case challenging generalized statements about sustainability, the court dismissed based on more

---

[10] RELX 2022 Annual Report at 67 (incorporated at footnote 2 of the Complaint), https://www.sec.gov/Archives/edgar/data/929869/000092986923000067/tmb-20230223xex99d1.pdf.

detailed information on the issuer's website. *See, e.g.*, *Fanucchi v. Enviva Inc.*, No. DKC 22-2844, 2024 U.S. Dist. LEXIS 117242, at *19 (D. Md. July 3, 2024).

In any event, Plaintiff does not attempt to engage in the specific, statement-by-statement analysis required by 15 U.S.C. § 78u-4(b)(1), which is itself a sufficient failure to require dismissal. While Plaintiff claims that there are "many examples" of "activities" that contradict RELX's "commitment to sustainability goals," only three are remotely pleaded in a statement-by-statement manner, and none of those three are accompanied by detailed explanations of why they would convey a materially different impression than the truth to reasonable investors. (Compl. ¶ 12). In each case, all that Plaintiff points to are generalized, forward-looking statements—"*aiming* to achieve net zero across all carbon scopes by 2040 at the latest," "*work to further* UNGC principles," "featur[ing] UNGC content," and "*work[s] to advance* the SDGs"—followed by facts that do not actually render them false. (*Id.*). A company can aim to achieve net zero carbon emissions by 2040 and yet still sell scientific journal articles that end users may use to help them drill for oil.[11] (*Id.*). A company can be working to further UNGC principles and yet still publish journals read by the oil-and-gas industry. (*Id.*). A company can work to further sustainable development goals and have had employees of its predecessor entity donate to a PAC that in turn donated between 2014 and 2016 to politicians whose stance on climate issues Plaintiff disagrees with. (*Id.*). Fundamentally, nothing about these forward-looking statements is false. As in *Backman*, it is at most information on the general subject of sustainability.

All of these statements, moreover, are exactly the sort of generic statements that have been held to be immaterial. They do not convey any specific, present fact regarding RELX's

---

[11] Indeed, Plaintiff conveniently ignores the "net" part of "net zero"—no serious policy goal asserts that humanity will produce absolutely zero carbon by 2050, and virtually all acknowledge there will be some ongoing need to produce oil and gas for the indefinite future. *See supra*, Note 10.

business that could be material to a reasonable investor. *See Fitzer v. Sec. Dynamics Techs.*, 119 F. Supp. 2d 12, 26 (D. Mass. 2000) ("Stuckey's statement offers no details on which a reasonable investor would rely, and thus, the statement is non-actionable."); *see also Altayyar v. Etsy, Inc.*, 731 F. App'x 35, 37-38 (2d Cir. 2018); *Gertz v. Vantel Int'l/Pearls in the Oyster Inc.*, No. 19-12036-FDS, 2020 U.S. Dist. LEXIS 123473, at *32 (D. Mass. July 14, 2020). Courts have held similar forward-looking statements about sustainability to be immaterial. *See Fanucchi v. Enviva Inc.*, 2024 U.S. Dist. LEXIS 117242, at *31 (dismissing where defendant did not state the "present degree" of compliance with forward-looking "sustainability commitments").

Here, Plaintiff does not identify any specific, factual statement that was false. He does not identify a specific, verifiable measure of sustainability that was falsely reported. He does not identify a standard that RELX claims *presently* to meet but actually does not. He does not claim that RELX is doing *nothing*, only that he views it as not doing enough. He has a subjective, philosophical disagreement with RELX about what it means to be sustainable and thinks that RELX should have adopted his views instead.

The securities laws do not exist to police such differences of opinion. *Cf. In re Diebold Nixdorf, Inc. Sec. Litig.*, No. 19-CV-6180 (LAP), 2021 U.S. Dist. LEXIS 62449, at *31 (S.D.N.Y. Mar. 30, 2021) ("That Individual Defendants may have held different opinions from Schmid regarding the Company's integration efforts does not mean that their opinions were false or misleading."). Plaintiff's securities fraud claim should be dismissed with prejudice for failure to plead a material misrepresentation or omission.

### B.     The Complaint Is Devoid of Allegations that RELX Intended to Defraud Investors, Let Alone Ones Giving Rise to a Strong Inference of Scienter.

Plaintiff's complaint likewise entirely flunks the requirement to plead *facts* giving rise to a strong inference of scienter. Under the PSLRA, a complaint must "state with particularity facts

giving rise to a strong inference that the defendant . . . either . . . consciously intended to defraud, or that they acted with a high degree of recklessness." *Quinones v. Frequency Therapeutics, Inc.*, 106 F.4th 177, 182 (1st Cir. 2024). A "strong" inference is "more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323-24 (2007)). In considering whether a complaint has alleged enough facts to survive a motion to dismiss under these heightened pleading standards, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

Plaintiff does not even attempt to provide facts to support his one-sentence conclusory allegation that "Defendants knew or deliberately disregarded that the statements were misleading." (Compl. ¶ 140). Even if Plaintiff tries to argue that his "ethics complaints" (which are pleaded only generically) or the reports that the group he created wrote meant that RELX knew *Plaintiff* believed that RELX was not doing enough to be sustainable, nothing in the complaint even attempts to confront opposing, innocent inferences. Most obviously, the innocent inference is that whoever reviewed Plaintiff's "ethics complaints" believed that any statements that they challenged were accurate and that Plaintiff's complaints simply reflected a difference of opinion about what sustainability meant. Differing opinions about what constitutes progress towards a generalized, forward-looking goal do not suffice to plead intent to defraud. *See In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005) ("[T]he fact that other individuals within SSB may have had views different from Grubman's does not provide any basis for an inference that *Grubman* did not believe his own professed opinions on Williams' value, or that the other valuation models, rather than Grubman's, constituted SSB's true

12

institutional opinion (if such a concept is even meaningful).") Because Plaintiff fails to rebut the obvious competing inference that others at RELX simply held a different view about what actions RELX should take to comply with aspirational statements about sustainability, he has not pleaded a strong inference of scienter.

### C.      By Plaintiff's Own Admission, He Knew the Truth Before Buying RELX Stock—And Challenges Statements *After* He Bought.

Plaintiff also fails to plead transaction causation or reliance, because the Complaint alleges that he was fully aware of the truth *before* he bought four shares of RELX stock and challenges statements made only *after* he bought them. This is the opposite of what a securities fraud claim requires. To state the obvious, neither Plaintiff nor the market could have relied in 2021 on statements made in RELX's 2022 annual report. (Compl. ¶ 12). That is a chronological impossibility. Rule 10b-5 prohibits only fraud in the buying or selling of securities, and requires an actual securities transaction. It is long settled that a claim that a shareholder might have bought or sold, but did not, is not actionable under the statute. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749 (1975). So, even if RELX had made misrepresentations *after* Plaintiff bought his securities, Plaintiff did not transact based on those statements.

Plaintiff alleges that "[t]hroughout his research in *early 2021*, Plaintiff found out shocking truths about Defendants' business practices," but alleges that he bought stock in March 2021. (Compl. ¶¶ 52-53 (emphasis added)). A person who already knows the truth cannot claim to have relied on a supposed representation. *See Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988); *Jackvony v. Riht Fin. Corp.*, 873 F.2d 411, 416 (1st Cir. 1989) (no reasonable reliance where public information known to purchaser contradicted representations).

Further, the efficient market hypothesis on which a fraud-on-the-market theory depends dictates that the price of RELX's stock already reflected public information such as RELX's

publications and the names of politicians who received donations from its predecessor's PAC. *See Karth v. Keryx Biopharmaceuticals, Inc.*, 334 F.R.D. 7, 21 (D. Mass. 2019) ("Karth is similarly unable to plausibly allege reliance because his July 2016 purchase of Keryx shares came after the curative disclosures in February and April 2016."). Neither Plaintiff nor the market could have been fooled by something both already knew. Indeed, the whole gist of Plaintiff's complaint is that *he knew all along*—that, after all, was why he was advocating for RELX to change aspects of its business that he disagreed with. The securities fraud claim should be dismissed with prejudice for this independent reason.

### D.   Plaintiff Does Not Allege Damages or Loss Causation.

Plaintiff's complaint is devoid of allegations that he suffered an economic loss or that any loss was caused by vague statements about sustainability. "To survive a Rule 12(b)(6) motion as to loss causation, a plaintiff must provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Shash*, 84 F.4th at 19 (internal quotations omitted). Generally, a plaintiff does so by alleging that the plaintiff bought stock at an inflated price after a misrepresentation, a "corrective disclosure" revealed the truth of what was misrepresented, and that "the stock price dropped soon after the corrective disclosure." *Id.* at 20.

Here, there are *zero* allegations of a price drop or corrective disclosure. Nor could there be: RELX's stock price has only increased since March 8, 2021, when Plaintiff alleges he bought stock.[12] (Compl. ¶ 4). And, in any event, all of the information Plaintiff alleges was misrepresented was available to the public anyway, so Plaintiff could not show that any price changes were caused by the revelation of information that was already public.

---

[12] *See* https://finance.yahoo.com/quote/RELX (last visited, October 7, 2024). The Court may take judicial notice of stock quotations. *E.g., Wang Yan v. ReWalk Robotics Ltd.*, 330 F. Supp. 3d 555, 563 (D. Mass. 2018) (taking judicial notice of stock prices on motion to dismiss securities fraud claims).

The Complaint is entirely devoid of factual allegations regarding loss and loss causation. The securities fraud claim should be dismissed for this reason as well.

### E. Plaintiff Failed to Provide A PSLRA Certification or Advertise for a Lead Plaintiff.

Finally, Plaintiff has not filed the required certification or proof of publication under the PSLRA, which alone requires dismissal of any class claims. *Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 60 (D. Mass. 1996) ("failure of the named plaintiff to file a certification with the complaint and to serve notice to class members are fatal to maintenance of the putative class action."); *accord In re USEC Sec. Litig.*, 168 F. Supp. 2d 560, 566 (D. Md. 2001).

There are strong indications, moreover, that Plaintiff *cannot* truthfully make the sworn statement required by the PSLRA. He appears to have acquired his four shares in RELX *after* forming the view that its sustainability statements were inaccurate, so he may very well have acquired them in order to file securities claims challenging the statements he disagreed with. *See* 15 U.S.C. § 78u-4(a)(2)(A)(ii) ("plaintiff did not purchase the security that is the subject of the complaint . . . in order to participate in any private action arising under this title"). And by attempting to leverage securities class action claims to try to get a better recovery on employment claims that are particular to him, he is assuredly attempting to "accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery." 15 U.S.C. § 78u-4(a)(2)(A)(vi).

## II. PLAINTIFF'S STATE AND FEDERAL DISABILITIES DISCRIMINATION CLAIMS ARE TIME-BARRED.

Both the Americans with Disabilities Act and Massachusetts Fair Employment Practices Act require an employee who alleges discrimination to file an administrative charge within 300 days of the alleged act of discrimination. 42 U.S.C. § 2000e-5(e)(1); Mass. Gen. L. ch. 151B § 5. The complaint affirmatively pleads that Plaintiff received notice of termination on June 7, 2023,

so he should have filed an administrative charge on or before April 2, 2024. (Compl. ¶¶ 95, 97). He did so two months late on June 2, 2024 (*id*. ¶ 25), and his statutory discrimination claims are thus time-barred.

Massachusetts law and federal law are equally clear that a discrimination claim accrues "upon the time of the discriminatory acts, not upon the time at which the consequences of the act become most painful." *Adamczyk*, 755 N.E.2d at 828 (alterations omitted); *accord Ricks*, 449 U.S. at 258; *Abraham*, 553 F.3d at 117. Put differently, a discrimination claim accrues "at the time the adverse employment decision is made and communicated to the employee,'" not on any later date on which the decision is implemented. *Abraham*, 553 F.3d at 118 (citing *Ricks*, 449 U.S. at 258-59).

Courts have consistently held that where an employee receives notice of termination, the 300-day period starts to run, even if an employer allows them to continue working for a period of time after receiving notice or (as here) grants a leave of absence. In the Supreme Court's seminal decision in *Ricks*, a college professor was denied tenure, resulting in his termination a year later. 449 U.S. at 257-58. The Supreme Court held that the claim accrued when the professor received notice of the denial of tenure, not the later date when the untenured appointment expired. *Id.* Likewise, in *Adamczyk*, a Massachusetts appellate court held that an age discrimination claim accrued on notice of a plant closing, not on the later date when it actually closed. 755 N.E.2d at 828. And in *Abraham*, an employee's time to file a charge to stop the statute of limitations from running started when he was told that he was being fired. 553 F.3d at 118.

A plaintiff's failure to timely file an administrative charge "results in barring the claimant from proceeding with a civil employment discrimination claim." *Adamczyk*, 755 N.E.2d at 827

(citing *Charland v. Muzi Motors, Inc.*, 631 N.E.2d 555 (1994)). That is the case even if a charge is later untimely filed. *See, e.g.*, *Ricks*, 449 U.S. at 255.

Here, Plaintiff's Complaint makes clear that the adverse employment decision was made and communicated to Plaintiff on June 7, 2023. (Compl. ¶¶ 95, 97). The Complaint clearly alleges that Plaintiff "received a termination letter" on June 7, 2023, meaning that the adverse action was communicated to him on that date. (*Id.* ¶ 97). Accordingly, June 7, 2023 is "the time the adverse employment decision [was] made and communicated to the employee.'" *Abraham*, 553 F.3d at 118 (citing *Ricks*, 449 U.S. at 258-59). From that date forward, Plaintiff had 300 days to file an administrative charge, meaning he needed to file one on or before April 2, 2024. Plaintiff filed his administrative charge on June 2, 2024, after his mandatory filing deadline.

Plaintiff's allegation that he was allowed a paid leave of absence <u>after</u> he was told he was being fired is irrelevant to the 300-day statute of limitations. The Supreme Court was clear in *Ricks* that "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." 449 U.S. at 257. Exactly like the professor in *Ricks* whose employment was not fully terminated until a year after receiving notice of the denial of tenure, 449 U.S. at 257-58, like the employee in *Abraham* who did not leave his company for months after receiving a termination notice, 553 F.3d at 118, and like the workers in *Adamczyk* whose plant did not close for months after they were notified of its closure, 755 N.E.2d at 828, Plaintiff's discrimination claim accrued on the day he received notice of his termination, not on the date he left the company. For that reason, his statutory discrimination claims are time-barred, and they must be dismissed.

III.     **PLAINTIFF'S ATTEMPTS TO PLEAD COMMON LAW EXCEPTIONS TO THE AT-WILL EMPLOYMENT DOCTRINE FAIL.**

Having failed to plead statutory employment claims, Plaintiff attempts to plead around the at-will employment doctrine by asserting common law claims. Specifically, Plaintiff seeks to assert a claim under the public policy exception to at-will employment and a claim for promissory estoppel. Both claims fail as, under settled law, they do not evade the reach of the at-will employment doctrine.

A.       **No Public Policy Exception to At-Will Employment Applies Here.**

Massachusetts courts have recognized only very narrow exceptions to the at-will employment doctrine based on public policy. They deal with situations where employees are terminated "for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)." *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*, 533 N.E.2d 1368, 1371 (Mass. 1989) (citations omitted).

These exceptions are deliberately narrow and are not subject to *ad hoc* expansion that would eviscerate the at-will rule. "In carving out these exceptions, the court has emphasized that the public policy exception should be narrowly construed to avoid converting the general at-will rule into a 'rule that requires just cause to terminate an at-will employee.'" *Meehan v. Med. Info. Tech., Inc.*, 177 N.E.3d 917, 920 (Mass. 2021) (quoting *King v. Driscoll*, 638 N.E.2d 488 (Mass. 1994)). Furthermore, Massachusetts courts have made clear "that the internal administration, policy, functioning, and other matters of an organization cannot be the basis for a public policy exception[.]" *Id*. at 920 (quotations omitted).

In *Meehan*, the Supreme Judicial Court discussed this point at length, providing multiple examples of cases that do not give rise to a public policy exception: an employee participating in

a shareholder derivative action, the reporting of internal problems to high-level officials, and the reporting of noncriminal wrongdoing. 177 N.E.3d at 921 (collecting cases). Massachusetts thus distinguishes between "important *public* deeds," like serving as a witness or on a jury, versus the internal affairs of a business. *Id*. at 920-21 (emphasis added) (citing *Flesner v. Tech. Commc'ns Corp.*, 575 N.E.2d 1107, 1111 (Mass. 1991) (serving as witness in government investigation). Actions that are legal duties of every citizen—such as testifying truthfully as a witness or serving on a jury—are protected. Other matters, no matter how worthy or righteous one may view the cause, are not.

Here, Plaintiff does not allege that he was fired for being a witness in a government investigation, serving on a jury, testifying pursuant to a subpoena, or anything of that sort. He alleges that he complained *internally* and leaked information *to a journalist*—exactly the sort of conduct directed to internal business affairs that *Meehan* says is not enough to warrant an exception from the at-will employment doctrine. In other words, his deeds were private deeds, not public ones, and they do not fall within the narrow public policy exception to at-will employment that Massachusetts recognizes.

## B.    Unspecified Policies Did Not Estop Defendants from Firing Plaintiff.

Finally, Plaintiff has alleged that his firing is actionable under a theory of promissory estoppel, because he says he relied on unspecified written policies by unspecified defendants. Massachusetts courts have refused to allow promissory estoppel based on vague statements that do not promise continued employment to undermine the at-will employment doctrine, and this case is no exception.

To start, the lack of a clear and unequivocal promise dooms the claim. Promissory estoppel requires a plaintiff to plead that the "defendant made a representation that was intended to induce action or specific inaction from [him], that [he] reasonably relied on the representation

when taking action and that injustice can only be avoided by enforcement of the promise." *AthenaHealth, Inc. v. May*, 290 F. Supp. 3d 108, 112 (D. Mass. 2018) (citations omitted). "An essential element under the promissory estoppel theory is that there be an unambiguous promise and that the party to whom the promise was made reasonably relied on the representation." *Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 647 N.E.2d 1174, 1178 (Mass. 1995) (quotations omitted).

That is even more true in the employment context, where courts have found that the at-will employment doctrine means it is unreasonable to rely on anything short of a clear and unambiguous promise. *E.g.*, *AthenaHealth*, 290 F. Supp. 3d at 112; *Treadwell v. John Hancock Mut. Life Ins. Co.*, 666 F. Supp. 278, 287 (D. Mass. 1987); *Coleman v. Cambridge Savings Bank*, 2023 Mass. App. Unpub. LEXIS 402, at *16-17 (Mass. App. Ct. Aug. 17, 2023).

Here, Plaintiff does not provide any details of the promises of continued employment he claims to have relied on, because there are none. Instead, Plaintiff has summarily stated that "various written policies" and "procedures" existed and that Defendants "breached their promises . . . and instead retaliated against [Plaintiff] for going through the written policies, resulting in his termination." (Compl. ¶¶ 147-49). That does not plead any kind of promise at all, let alone a clear and unambiguous promise of continued employment notwithstanding the at-will employment doctrine. Plaintiff has thus failed to plead either "an unambiguous promise" or the detrimental reliance thereon that the law requires for a viable promissory estoppel claim. *Rhode Island Hosp. Trust*, 647 N.E.2d at 1178. Plaintiff's promissory estoppel claim must be dismissed.

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed in its entirety, with prejudice.

Dated: October 16, 2024

Respectfully submitted,

STEPTOE LLP

/s/ Alexander Wolf
Alexander Wolf (BBO # 685374)
717 Texas Avenue, Suite 2800
Houston, Texas 77002
(713) 221-2300
awolf@steptoe.com

Nathaniel J. Kritzer (*pro hac* forthcoming)
Joseph Sanderson (*pro hac* forthcoming)
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900
nkritzer@steptoe.com
josanderson@steptoe.com

B. Gammon Fain (*pro hac* forthcoming)
1330 Connecticut Avenue NW
Washington, District of Columbia 20036
(202) 429-3000
gfain@steptoe.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that true and correct copies of this pleading are being filed on October 16, 2024 through the CM/ECF system, and will be sent electronically to registered participants as identified on the Notice of Electronic Filing.

/s/ Alexander Wolf
Alexander Wolf