**Juyoun Han (pro hac vice)**
**Eric Baum (pro hac forthcoming)**
Eisenberg & Baum LLP
24 Union Square East, Penthouse
New York, NY 10003
Telephone: 212-353-8700
jhan@eandblaw.com
*Attorneys for Plaintiff*

**Angie I. Martell**
Iglesia Martell Law Firm PLLC
2723 S. State Street, Suite 150
Ann Arbor, MI 48104
Telephone: 734-369-2331
angie@iglesiamartell.com
*Local Counsel*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KIP LYALL, on behalf of himself and all others similarly situated,<br>*Plaintiff*,<br><br>v.<br><br>ELSEVIER INC, RELX PLC, and CELL PRESS INC,<br><br>*Defendants*. | Civil Action No. 24-cv-12022<br><br>**FIRST AMENDED COMPLAINT [CLASS ACTION]**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kip Lyall, through his attorneys, Eisenberg & Baum, LLP, brings this First Amended class action complaint against Defendants Cell Press Inc., Elsevier Inc. and RELX PLC (collectively hereinafter, Defendants):

### INTRODUCTION

1.      This lawsuit is brought by Kip Lyall who was employed at Cell Press from 2014 until his termination in 2023 as an Illustration & Design Program Manager at Cell Press, alleging violation of the Americans with Disabilities Act, Fair Employment Practices Act, Wrongful Discharge in Violation of Public Policy, Securities Exchange Act Section 10(b) and Rule 10b-5,

1

and Promissory Estoppel.

2.      RELX PLC. is the world's largest global publishing house and owns the most renowned data analytics companies such as LexisNexis and Martindale-Hubbel.

3.      According to its website, RELX PLC is a publicly shared company "traded through [its] primary listing on the London Stock Exchange and its secondary listing on Euronext Amsterdam, while its securities are also traded on the New York Stock Exchange under its American Depositary Share Programme. Accordingly, the Board has implemented standards of corporate governance and disclosure applicable to a UK incorporated company, with listings in London, Amsterdam and New York."[1]

4.      Mr. Lyall is  a RELX investor.  On March 8, 2021, Mr. Lyall purchased 4 shares of RELX stock. *See* Certification (Exhibit A). Mr. Lyall also owned shares of RELX via funds that he had invested in which includes RELX: Vanguard Star Fund (purchased in 2018), Domini Impact International Equity Inv (purchased on 11/24/2014), PIMCO Total Return ESG Institutional (purchased on 6/11/2013), and PXNIX Impax International Sust Econ Instl (purchased on 8/4/2021). *Id*.

5.      Elsevier is a subsidiary of RELX Group. Inc and one of the world's largest academic publishing companies specializing in scientific, technical, and medical contents which operates databases and publishes literature such as the widely used scientific, technical, and medical research platform ScienceDirect.

6.      Cell Press is a publisher of scientific journals and subsidiary of Elsevier Inc. (hereinafter, "Elsevier").

7.      Mr. Lyall worked at Defendants' company since 2014. On or around 2020, Mr.

---

[1] *Corporate Governance and Structure*, RELX, https://www.relx.com/investors/corporate-governance/corporate-governance-and-structure (last accessed July 22, 2024).

Lyall discovered that Defendants were engaged in greenwashing: Behind the eyes of the public, Defendants' actively supported fossil fuel expansion while in their public statements, they pledged to protect the climate as part of their public-facing marketing. Mr. Lyall felt misled by the Defendants. Mr. Lyall decided to speak up to Defendants regarding his climate-related concerns. Plaintiff alleges that instead of acknowledging the concerns and engaging in change, Defendants intimidated and harassed him. And in August 2023, Mr. Lyall was terminated from his job, alleged for speaking out against the company's greenwashing practices.

8.      Plaintiff recounts the experience: The pressure put on me to conform to the company's "narrative" turned my paycheck into a bribe, and the guilt from that blended with the overwhelming feeling that I was not doing enough given the scale of this emergency.

9.      This complaint alleges Defendants' misrepresentations about its environmental sustainability commitment which misled shareholders, consumers, the scientific community, and members of the public. Plaintiff alleges that Defendants have made bold representations and pledges committing to environmental sustainability goals, but hidden from the public eye, Defendants made numerous business decisions that contradict their climate pledges in materials filed to the SEC and disclosed to investors, marketing materials, and commitments to international organizations.

10.      For example, according to the Annual Reports filed with the SEC, Defendants signed on to the Climate Pledge stating its commitment to minimize their climate impacts in line with the scale of action deemed necessary by science to hold warming to 1.5°C (per the Paris Climate Agreement) and support global efforts to achieve net zero emissions before 2050—goals that require a steep reduction in greenhouse gas emissions this decade and no new fossil fuel

projects after 2021.[2]

11.     In 2021 RELX had committed to Net Zero and Race to Zero.[3] As declared by the United Nations Secretary-General, "net-zero cannot be a mere public relations exercise." When a company commits to UN's Net Zero and Race to Zero, it means: "Non-state actors cannot claim to be net zero while continuing to build or invest in new fossil fuel supply. Non-state actors cannot lobby to undermine ambitious government climate policies either directly or through trade associations or other bodies. Instead, they must align their advocacy, as well as their governance and business strategies with their climate commitments."[4] Contrary to RELX's commitment to Net Zero and Race to Zero, The RELX Inc Political Action Committee (PAC) supports politicians who deny climate change,[5] works with numerous companies who have been prosecuted for perpetuating environmental harm,[6] and actively provide services and publications to support fossil fuel companies.[7]

---

[2] RELX, ANNUAL REPORT 2022, INCLUDING FINANCIAL STATEMENTS AND CORPORATE RESPONSIBILITY REPORT 66–67 (2022), https://www.sec.gov/Archives/edgar/data/929869/000092986923000067/tmb-20230223xex99d1.pdf.; Race to Zero Interpretation Guide, UNFCC, EPRG interpretation guide (unfccc.int) ( "Pledge at the head-of-organisation level to reach (net) zero* GHGs as soon as possible, and by 2050 at the latest, in line with the scientific consensus on the global effort needed to limit warming to 1.5C with no or limited overshoot, recognising that this requires halting deforestation and phasing down and out all unabated fossil fuels as part of a global, just transition. Set an interim target to achieve in the next decade, which reflects maximum effort toward or beyond a fair share of the 50% global reduction in CO2 by 2030")

[3] RELX signs the Climate Pledge, ERELX, https://stories.relx.com/relx-environment/index.html (Last accessed, January 5, 2025).

[4] UN, *Integrity Matters Net Zero Commitments by Businesses*, https://www.un.org/sites/un2.un.org/files/high-level_expert_group_n7b.pdf

[5] According to OpenSecrets, a nonpartisan, independent, nonprofit organization that tracks campaign contributions, between 2016 and 2014, RELX Inc PAC contributed thousands of dollars to climate change deniers like Neal Dun (R-Fla), Vernon Buchanan (R-Fla), Jim Jordan (R-Ohio), Cathy McMorris Rodgers (R-Wash), and Drew Ferguson (R-Ga), among others. *RELX Inc PAC Contributions to Federal Candidates*, OPENSECRETS, https://www.opensecrets.org/political-action-committees-pacs/relx-inc/C00345793/candidate-recipients/2024 (last accessed July 22, 2024).

[6] *Supra* note 5.

[7] ScienceDirect, operated by Elsevier, publishes the following journals: *Petroleum Exploration and Development*, *Petroleum*, *Petroleum Research*, and *Journal of Pipeline Science and Engineering*. These journals contribute to the scientific and technological development of petroleum exploration and production. *See, e.g.*, *Petroleum Exploration and Development*, SCIENCEDIRECT, https://www.sciencedirect.com/journal/petroleum-exploration-and-development (last accessed July 22, 2024); *Petroleum*, SCIENCEDIRECT, https://www.sciencedirect.com/journal/petroleum (last accessed July 22, 2024); *Petroleum Research*, SCIENCEDIRECT, https://www.sciencedirect.com/journal/petroleum-

12.    Elsevier also made the following representations in their 2022 Annual Report filed to the SEC: "Elsevier is working to support clean energy. In 2022, Elsevier launched a free report titled Pathways to Net Zero . . .The books team further implemented its Energy with Purpose mission statement to only commission new content that advances the energy transition and reduction of $CO_2$ emissions. . . Leadership made the decision to close one hydrocarbon journal and transition remaining titles with updated aims and scope . . . explicitly calling for research related to UN Sustainable Development Goal (SDG), Affordable and Clean Energy. . . Elsevier's Geofacets . . . focused on discovering efficiencies in established energy projects rather than new fossil fuel exploration."[8]

13.    Yet, the above representations were untrue. In 2023 and 2024, Elsevier continued to profit from, promote and support the expansion fossil fuels projects and owned 9 of the top 20 oil, petroleum, and natural gas journals all of which continued to advance future exploration of fossil fuel projects, advance oil and gas exploration activities, and guide natural resource exploration.[9]

14.    Defendants also stated to shareholders that they are adhering to the United Nations Global Compact (UNGC), "ensuring that no function is conflicting with company sustainability commitments and objectives."[10] Yet, RELX's statement was not true because it continued to fact publishes journals for oil and gas technology and provide strategies for new fossil fuel and petroleum exploration.

---

research (last accessed July 22, 2024); *Journal of Pipeline Science and Engineering*, SCIENCEDIRECT, https://www.sciencedirect.com/journal/journal-of-pipeline-science-and-engineering (last accessed July 22, 2024).
[8] RELX 2022 Annual Report, at 74, UN, Integrity Matters Net Zero Commitments by Businesses, https://www.un.org/sites/un2.un.org/files/high- level_expert_group_n7b.pdf
[9] Climate Rights Coalition, Research paper examples (2024 and 2023), https://www.climaterightscoalition.com/papers
[10] *Id*. at 33.

15.     A petition submitted by the Union of Concerned Scientists and Scientists for Global Responsibility in September 2023 calls on Elsevier and RELX to cease engaging in business activities that are demonstrably antithetical to meeting the UN Race to Zero climate goals, including (a) providing fossil fuel industry-oriented research and data services; (b) lobbying and financially supporting US politicians who block climate action; and (c) host fossil fuel industry exhibitions that enable participants to grow their businesses and increase fossil fuel production, among other activities. The petition is endorsed by over 380 prominent and notable scientists.[11]

16.     Defendants were aware that their business practices were contradicting their commitments to sustainability and environmental protection. In a statement to press, a leading sustainability scientist at Lund University, Professor Kimberly Nicholas pointed out the problem of RELX's greenwashing: "If the same publisher putting out the papers that show definitively we can't burn any more fossil fuels and stay within this carbon budget is also helping the fossil fuel industry do just that, what does that do to the whole premise of validity around the climate research? That is what's deeply concerning about these conflicts," she said.[12]

17.     Dr. Kimberly Nicholas was also a guest at Elsevier's 2021 SUSTAIN Festival, where she informed employees, "We have to stop the carbon and climate pollution at its source . . . turning off the tap is really, really critical. The International Energy Agency, IPCC, and every other alphabet soup of analysts is saying that, nope, there's no more room for fossil fuel expansion."

---

[11] Petition to Elsevier and RELX on Fossil Fuel Industry Engagement, last accessed July 22, 2024, https://ucs-documents.s3.amazonaws.com/global-warming/UCS-SGR-Petition.pdf; *Elsevier and RELX's Climate Problem*, UNION OF CONCERNED SCIENTISTS (Sept. 19, 2023), https://www.ucsusa.org/resources/elsevier-and-relxs-climate-problem.
[12] *Id.*

18.     Plaintiff, an employee and as a shareholder of RELX stocks, was also misled by Defendants' statements and shocked to discover that the Defendants' business practices contradicted their statements and reputation they held out in public.

19.     Plaintiff and a group of climate-concerned employees at Defendants' companies brought the concerns of greenwashing to the attention of Defendants, through collaboratively written reports based on research, ethics complaint channels, and upstanding attitudes.

20.     However, in contradiction to Defendants' stated commitment to "facilitate dialogue and spark interdisciplinary collaboration" for sustainability,[13] Plaintiff alleges that Defendants systematically retaliated against Plaintiff and suppressed the speech of their own employees—scientists, environmentalists, editorial and design specialists—who spoke out against Defendants' failure to align their business practices with their stated sustainability goals.

21.     Upon information, when an article was published in the *Guardian* in 2022 reporting about the Defendants' hypocritical conduct that contradicted their stated climate commitments, Defendants suspected Plaintiff Kip Lyall to be the source of the information provided to the Guardian.[14]

22.     Defendants specifically pressured, harassed, retaliated, and terminated Plaintiff Kip Lyall for advocating for Defendants to align their actions with their sustainability pledges.

23.     As a result of the Defendants' deceptive business practices, and pressure and harassment targeting Plaintiff, Plaintiff experienced severe decline in mental health. Plaintiff suffered from anxiety and helplessness when Defendants' leadership refused to acknowledge the irreversible harms associated with its business conduct at the expense of global health. He experienced grief and despair while observing people in management and power take willfully

---

[13] *Sustainability Hub*, CELL PRESS, https://www.cell.com/sustainability (last accessed July 22, 2024).
[14] Westervelt, *supra* note 4.

performative action to exacerbate the climate crisis and manipulate the findings of scientists for their own profit. He felt unsafe at his workplace due to the Defendants' harassment, isolation, and pressure toward Plaintiff.

24.     Because of the mental health decline, Plaintiff sought professional counseling and psychotherapy. In March 2023, he was diagnosed with "adjustment disorder with anxiety because he has been struggling with [his] work situation. His circumstances in his professional life have made it difficult for him to maintain his integrity, but he has managed to preserve it thus far."

25.     Per the mental health professional's written letter, Plaintiff requested to the Defendants the accommodation of limiting mandatory meetings to a maximum of 45 minutes as "additional time poses a greater risk to [Plaintiff's] mental health" and that Plaintiff "be given a minimum of one business day advanced notice of any mandatory meetings. Plaintiff alleges that Defendants failed to provide the accommodations and instead terminated him.

26.     As a result, on June 3, 2024, Plaintiff filed a complaint to the Massachusetts Commission Against Discrimination, and now brings this lawsuit against Defendants.

## PARTIES

27.     Plaintiff Kip Lyall is a former employee of Cell Press, a publisher of scientific journals and subsidiary of Elsevier, where he was an Illustration & Design Program Manager. At all relevant times, Plaintiff Kip Lyall's place of employment was at Cell Press's office located at 50 Hampshire Street, 5th Floor, Cambridge, Massachusetts 02139.

28.     Defendant RELX Group PLC ("RELX") is a British multinational information and analytics company headquartered in London, England.

29.     Defendant Elsevier is a Dutch academic publishing company with an office in

Cambridge, Massachusetts. Elsevier specializes in publishing scientific, technical, and medical content. Elsevier is a subsidiary of RELX.

30.     Defendant Cell Press is a company that publishes over 50 scientific journals across the life, physical, earth, and health sciences with its principal place of business in Cambridge, Massachusetts. Cell Press is a subsidiary of both Elsevier and RELX.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), as it involves allegations of violation of federal law. Jurisdiction is conferred by Section 27 of the Exchange Act and the Americans with Disabilities Act. Court has jurisdiction under 18 U.S.C. § 1331.

32.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy, exclusive of interest and costs, exceeds $5,000,000, and is a class action in which some members of the class are citizens of states different from the states where Defendants are citizens. All of the named Plaintiffs in this action are citizens of a different state than the Defendants.

33.     This Court has pendent jurisdiction of all alleged state law claims.

34.     Venue is appropriate in this District because Plaintiff is a resident of this District and Defendants' discriminatory conduct occurred within the District of Massachusetts.

35.     Plaintiff timely exhausted administrative remedies by filing a charge against Defendants Elsevier and Cell Press on June 2, 2024 with the Massachusetts Commission Against Discrimination ("MCAD.")

36.     On June 20, 2024 Plaintiff filed a request for permission to withdraw and remove the case to the Court. Plaintiff believes he has good cause to remove this case to court given that

he has been receiving letters from Defendants threatening to take legal action against him for issues that are relevant to this action.

## STATEMENT OF FACTS

### *The Dangers of Corporate Greenwashing and Examples in Industry*

37.     According to the United Nations, "greenwashing" is described as "misleading the public to believe that a company or other entity is doing more to protect the environment than it is, [and] promot[ing] false solutions to the climate crisis that distract from and delay concrete and credible action . . . Tactics include:

> a. Claiming to be on track to reduce a company's polluting emissions to net zero when no credible plan is actually in place.
> b. Emphasizing a single environmental attribute while ignoring other impacts.
> c. Communicating the sustainability attributes of a product in isolation of brand activities (and vice versa) – e.g. a garment made from recycled materials that is produced in a high-emitting factory that pollutes the air and nearby waterways.[15]

38.     A recent example of corporate greenwashing was shown through the U.S. Securities and Exchange Commission's crackdown on DWS, a subsidiary of Deutsche Bank which was ordered to pay $25 million in penalties for engaging in corporate greenwashing. According to the SEC order, DWA marketed itself to clients and investors as a "leader in ESG." For example, in 2019, a DWS senior leader described in a public marketing piece that ESG is "top of mind throughout our organization" through use of a proprietary "DWS ESG Engine." But in DWS failed to implement its ESG integration policy in practice.[16] DWS's greenwashing came to light after a whistleblower, the head of sustainability at DWS, and American named Desirée

---

[15] *Greenwashing – The Deceptive Tactics Behind Environmental Claims*, UNITED NATIONS, https://www.un.org/en/climatechange/science/climate-issues/greenwashing (last accessed July 22, 2024).
[16] *In Matter of DWS Investment Management Americas, Inc.*, No. 3-21709 (Sec. and Exch. Comm'n Sept. 25, 2023), https://www.sec.gov/files/litigation/admin/2023/ia-6432.pdf.

Fixler, spoke out to the management internally of having portrayed DWS as being far "greener" than it actually was. She was fired as a result.[17]

39.     Studies have exposed that greenwashing is becoming common place in many corporate social responsibility engagements, with a growing number of large multinational enterprises making performative promises about sustainability, even though their current operations are inherently unsustainable.[18]

***Defendants' Greenwashing Practices are Materially Misleading to Consumers, Investors, and Impose Severe Public Harm***

40.     Defendants frequently made misleading statements about their commitment to environmental sustainability. While publicly making commitments to key international sustainability codes that allowed them to be listed as one of the leading ESG investment options, they frequently engaged in actions and business practices in private that contradict those commitments and statements.

41.     For example, in 2021 RELX committed to Net Zero and Race to Zero, which are key international campaigns for promoting environmental sustainability.[19] As declared by the United Nations Secretary-General, "net-zero cannot be a mere public relations exercise." When a company commits to UN's Net Zero and Race to Zero, it means: "Non-state actors cannot claim

---

[17] Interview with Desirée Fixler, former Head of Sustainability at DWS (May 12, 2023), https://www.spiegel.de/international/business/whistleblower-desiree-fixler-on-the-dws-and-deutsche-bank-controversy-i-haven-t-seen-such-a-cultural-overhaul-a-33485af6-180c-4174-ac12-1aa4967ba971.
[18] Sebastião Vieira de Freitas Netto, Marcos Felipe Falcão Sobral, Ana Regina Bezerra Ribeiro, and Gleibson Robert da Luz Soares, *Concepts and Forms of Greenwashing: A Systematic Review*, ENVIRONMENTAL SCIENCES EUROPE (Feb. 11, 2020), https://enveurope.springeropen.com/articles/10.1186/s12302-020-0300-3; Honglei Mu and Youngchan Lee, *Greenwashing in Corporate Social Responsibility: A Dual-Faceted Analysis of Its Impact on Employee Trust and Identification*, SUSTAINABILITY (Nov. 7, 2023), https://www.mdpi.com/2071-1050/15/22/15693; Antonio J. Mateo-Márquez, José M. González-González, and Constancio Zamora-Ramírez, *An International Empirical Study of Greenwashing and Voluntary Carbon Disclosure*, JOURNAL OF CLEANER PRODUCTION (June 2022), https://www.researchgate.net/publication/361104761_An_international_empirical_study_of_greenwashing_and_voluntary_carbon_disclosure.
[19] RELX signs the Climate Pledge, ERELX, https://stories.relx.com/relx-environment/index.html (Last accessed, January 5, 2025).

to be net zero while continuing to build or invest in new fossil fuel supply. <u>Non-state actors</u>

<u>cannot lobby to undermine ambitious government climate policies either directly or through</u>

<u>trade associations or other bodies. Instead, they must align their advocacy, as well as their</u>

<u>governance and business strategies with their climate commitments.</u>"[20]

42.    To public and to investors, RELX's Chief Sustainability Officer

(CSO) promotes RELX's "responsible lobbying" and its commitment to the UNGC's 10

Principles while urging other businesses to do the same.[21]

43.    But contrary to RELX's stated commitment to Net Zero and Race to Zero, The

RELX Inc Political Action Committee (PAC) supports politicians who deny climate change,[22]

works with numerous companies who have been prosecuted for perpetuating environmental

harm,[23] and actively provide services and publications to support fossil fuel exploration and

companies.[24]

44.    Elsevier also made the following public representations in their 2022 Annual

Report filed to the SEC:  "Elsevier is working to support clean energy. In 2022, Elsevier

launched a free report titled Pathways to Net Zero . . .The books team further implemented its

---

[20] UN, *Integrity Matters Net Zero Commitments by Businesses*, https://www.un.org/sites/un2.un.org/files/high-level_expert_group_n7b.pdf

[21] *Marcia Balisciano on Inspiring All Company levels to Embrace Sustainability Goals,* CSO Impact Podcast (July 3, 2024), https://www.youtube.com/watch?v=DWyIM2xeOoo

[22] According to OpenSecrets, a nonpartisan, independent, nonprofit organization that tracks campaign contributions, between 2016 and 2014, RELX Inc PAC contributed thousands of dollars to climate change deniers like Neal Dun (R-Fla), Vernon Buchanan (R-Fla), Jim Jordan (R-Ohio), Cathy McMorris Rodgers (R-Wash), and Drew Ferguson (R-Ga), among others. *RELX Inc PAC Contributions to Federal Candidates*, OPENSECRETS, https://www.opensecrets.org/political-action-committees-pacs/relx-inc/C00345793/candidate-recipients/2024 (last accessed July 22, 2024).

[23] *Supra* note 5.

[24] ScienceDirect, operated by Elsevier, publishes the following journals: *Petroleum Exploration and Development*, *Petroleum*, *Petroleum Research*, and *Journal of Pipeline Science and Engineering*. These journals contribute to the scientific and technological development of petroleum exploration and production. *See, e.g.*, *Petroleum Exploration and Development*, SCIENCEDIRECT, https://www.sciencedirect.com/journal/petroleum-exploration-and-development (last accessed July 22, 2024); *Petroleum*, SCIENCEDIRECT, https://www.sciencedirect.com/journal/petroleum (last accessed July 22, 2024); *Petroleum Research*, SCIENCEDIRECT, https://www.sciencedirect.com/journal/petroleum-research (last accessed July 22, 2024); *Journal of Pipeline Science and Engineering*, SCIENCEDIRECT, https://www.sciencedirect.com/journal/journal-of-pipeline-science-and-engineering (last accessed July 22, 2024).

Energy with Purpose mission <u>statement to only commission new content that advances the</u> <u>energy transition and reduction of CO2 emissions.</u> . . Leadership made the decision to close one hydrocarbon journal and transition remaining titles with updated aims and scope . . . explicitly calling for research related to UN Sustainable Development Goal (SDG), Affordable and Clean Energy. . . Elsevier's Geofacets . . . focused on discovering efficiencies in established energy projects <u>rather than new fossil fuel exploration.</u>"[25]

45.    Yet, the above representations are untrue. In 2023 and 2024, Elsevier continued to profit from, promote and support the expansion fossil fuels projects and owns 9 of the top 20 oil, petroleum, and natural gas journals all of which continued to advance future exploration of fossil fuel projects, advance oil and gas exploration activities, and guide natural resource exploration.[26]

46.    Defendants also stated to shareholders that they are adhering to the United Nations Global Compact (UNGC), "ensuring that no function is conflicting with company sustainability commitments and objectives."[27] According to UNGC, adherence includes: "Committing to going 100% renewable" and "divesting from fossil fuels."[28] RELX stated will "work to further UNGC principles within RELX and in [their] supply chain". Yet, RELX's statement was not true because it continued to fact publishes journals for oil and gas technology and provide strategies for new fossil fuel and petroleum exploration. [29]

47.    Defendants actively and frequently participates in greenwashing, including (a)

---

[25] RELX 2022 Annual Report, at 74, UN, Integrity Matters Net Zero Commitments by Businesses, https://www.un.org/sites/un2.un.org/files/high- level_expert_group_n7b.pdf
[26] Climate Rights Coalition, Research paper examples (2024 and 2023), https://www.climaterightscoalition.com/papers
[27] *Id.* at 33.
[28] UNGC, CLIMATE Brief, https://unglobalcompact.org/take-action/20th-anniversary-campaign/uniting-business-to-tackle-covid-19/climate (last accessed, Nov. 17, 2024)
[29] Climate Rights Coalition, Research paper examples (2024 and 2023), https://www.climaterightscoalition.com/papers

providing fossil fuel industry-oriented research and development as well as data services that are being used by most top oil, gas, and coal companies;[30] (b) lobby and financially support US politicians who block climate action;[31] (c) disseminate content that reveals petroleum exploration areas, inform exploration practices and techniques, provide the fossil fuel industry with legal resources for expansion, and promote research and development for new technologies needed for deep-water, Arctic, and non-conventional exploration;[32] (d) host coal, offshore drilling, and other industry exhibitions that enable participants to grow their businesses and boost fossil fuel production.[33]

48.    Defendants were repeatedly made aware of their greenwashing practices by their own employees, including a group called the Responsible Growth Report Committee (hereinafter "RGRC") led by Plaintiff.

49.    Between September 2021 and April 2023, Mr. Lyall spearheaded the effort of the RGRC to publish six Responsible Growth Reports (hereinafter "RGR"): three full-length reports and three shorter updates.

50.    RGRs are "unofficial and internal documents" that include the RGRC's observations related to how RELX's policies, marketing, and public statements are misaligned with its business practices, particularly as it relates to climate, human rights, and greenwashing.

51.    In January 2022, Plaintiff shared its Fall 2021 RGR and slides from a January 2022 meeting with all Cell Press employees in the hopes of creating more open and honest discussions about Elsevier and RELX's policies with respect to climate-related human rights

---

[30] Westervelt, *supra* note 4.
[31] OPENSECRETS, *supra* note 7.
[32] *See supra* note 9 and accompanying text.
[33] *See, e.g.*, *Queensland Mining & Engineer Exhibition: The Largest Regional mining Event in Australia*, QUEENSLAND MINING EXHIBITION, https://www.queenslandminingexpo.com.au/ (last accessed July 22, 2024).

impacts. *See* Exhibit C and D.

52.     Below table in the Winter 2022 Update highlight the discrepancy in Elsevier and RELX's policies and statements and their business practices, including partnering with companies that violate environmental and human rights, financially supporting politicians who deny climate change via lobbying activities, and publishing research articles and offering services that accelerate the discovery of oil and gas. Exhibit C at 16.

| Company policies and statements | Business practices |
|---|---|
| RELX's communication on progress regarding our adherence to the UNGC states that the Company has "place[d] responsibility for execution of sustainability strategy in relevant corporate functions (procurement, government affairs, human resources, legal, etc) ensuring that **no function is conflicting with company sustainability commitments and objectives.**"[1] | Asked if this means REPAC has been reformed to comply with sustainability commitments, an ICB member replied: **The short answer is no.**"[2]<br><br>"[REPAC is] looking for things that are important for our paychecks… [a] frontline watching for things that will tank our stock value."[3] |
| Ensure **lobbying activities don't elevate false assertions** which harm the ability of States and the public to address climate change [4] | Finantially support politicians who **deny climate change** and block urgently required action<br><br>*For example: "There isn't any real science to say we are altering the climate path of the earth." (Roy Blunt) "This whole global warming myth will be exposed as what it really is." (James Lankford)* |
| Work with **ethical partners** who demonstrate a responsible approach to managing their environmental impact [5] | Adani, Anglo American, BHP and Glencore, for example: all are being sued for **environmental and human rights violations** |
| Elsevier helps researchers and healthcare professionals advance science and **improve health outcomes for the benefit of society** through our high quality information and analytics products.[6] | Elsevier uses geological research and other data generated by the scientific community and incorporates it into products and services intended to facilitate the discovery of new fossil fuels; the scientific community says this activity will **decimate global heath and global stability**.[7] |
| We have set a science-based target and have built upon longstanding environmental efforts… **advocating for [climate] action within the communities we serve.**[8] | **Petroleum companies and universities, as well as research institutes**, should work together to overcome difficulties in theory and practical technology **for deep oil and gas exploration and development**.[9] (2021) |

1) https://www.unglobalcompact.org/participation/report/cop/create-and-submit/advanced/455787   2) ICB member, Elsevier Q&A, December 2020   3) Call with 2 REPAC board members, June 16, 2020
4) UNGP   5) Sustainability Charter   6) Elsevier CEO   7) See page 3; also, *The Lancet Countdown on health and climate change*   8) Elsevier Climate Emergency Statement   9) Journal of Natural Gas Geoscience

**[Table 1 – Excerpt from Winter 2022 Update, page 15]**

| Company policies and statements | Business practices |
|---|---|
| Response to the crisis is at the necessary scale of action as **determined by science** [1] | [The] RX view of when coal should be phased out – that is **a matter for policy makers** [2] |
| Each business unit is accountable for ensuring policy compliance, recognizing the impact of **consumer use of products and services** [3] | Our footprint...**doesn't include the things our customers do with what we create** [4] |
| Use a precautionary approach to environmental challenges; **emphasize the prevention of harm** [5]<br><br>**Discontinue activities** with potentially adverse climate change related impacts [6] | Elsevier markets ScienceDirect, our journals, and, as "the leading book publisher for the oil and gas industry," our books as a means for the industry to **accelerate discoveries** [7]<br><br>We have data-driven services intended to "**stimulate global oil production for decades to come**" [8]<br><br>*"**Our users really want to** get their hands on everything and anything to find that key insight to help them **answer the question, "Where am I going to go to next?"** No matter how our customer needs and desires and pain points evolve, **we will always try** and develop the feature or the content source **to really answer those needs.**"* [9] |
| Our science-based target underpins our climate action program, **guided by our independent climate advisory board**. [10]<br><br>We are advised by an external Climate Advisory Board that help to guide our actions. [11] | **External Climate Advisory Board members**<br><br>● **"It is well known that proven fossil fuel reserves are much higher than we can emit to meet the Paris goals** – so that many companies already have unburnable carbon/oil on their balance sheet."[12]<br><br>● **"Fossil fuel industries have to be shut down as soon as possible**"[13] |

1] RELX Global Environment Policy  2] RX CEO  3] RELX Global Environment Policy  4] SUSTAIN Festival, Net Zero presetation  5] UNGP  6] UNGC  7] https://www.elsevier.com/about/press-releases/archive/science-and-technology/elsevier-acquires-certain-book-assets-of-gulf-publishing-company; Elsevier PDF: Added Value for the Oil and Gas Industry  8] Elsevier PDF: R&D Solutions for Oil and Gas  9] Product manager, Geofacets  10] Elsevier CEO  11] Elsevier Climate Emergency Statement  12] Prof. Dr. Arnold Tukker  13] Joyashree Roy: Coordinating Lead Author of Chapter 5, IPCC Special Report on 1.5°C

**[Table 2 – Excerpt from Winter 2022 Update, page 17]**

53.     In or around April 2022, the RGRC published its Spring 2022 RGR, which included a table illustrating the statements and omissions in the 2021 Corporate Responsibility investor presentation. *See* Exhibit E at 5-6.

54.     The thoroughly researched RGRC publication points out statements made by Defendants to its shareholders which materially misled investors to believe that RELX has a robust CSR program and implementing ESG goals to its business practice.

55.     Defendants' statements surrounding corporate responsibility were aimed to such attract investors who are consciously making investments in ESG funds. "Investors increasingly believe companies that perform well on ESG are less risky, better positioned for the long term

16

and better prepared for uncertainty." [34]

56.    RELX's misstatements created a reliance on members of the public who believe in their statements and commitments to protect the environment. For example, a pension scheme provider included RELX in its Impact Plan and spotlighted it: "RELX has demonstrated measurable impacts on both society and the environment. But beyond the tools it develops its stated purpose is that these tools are used for the benefit of the world. This is why it was selected for inclusion in the Impact Plan."[35]

57.    RELX misrepresented to asset and investment management companies about their business practices so that they can deceptively gain funds from investors who seek sustainability as a criteria for making investments. As an additional example, in 2021, RELX achieved the lowest ESG risk rating from Morningstar[36] which screens against companies that have a material involvement in supplying fossil fuel companies with goods or services.[37]  In 2022, IMPAX International Sustainable Economy Fund which stands for a "fossil fuel-free profile" held over 400,000 share of RELX stock.[38]

58.    In 2023, RELX was one of 15 companies in the Aoris investment portfolio, which applies "ESG principles to [its] ownership decisions" and Aoris cites RELX's net zero pledge.[39]

59.    Also in 2023, RELX was a top investment for 8 of Schroder's funds. Schroder

---

[34] Matthew Bell, *Why ESG Performance is Growing in Importance for Investors*, EY (Mar. 9, 2021), https://www.ey.com/en_us/insights/assurance/why-esg-performance-is-growing-in-importance-for-investors.
[35] PensionBee, Impact Plan RELX,
https://web.archive.org/web/20240809003356/https://www.pensionbee.com/uk/blog/2023/december/impact-plan-relx
[36] 6 Dividend Stocks that are Sustainable Twice Over, MORNINGSTAR,
https://www.morningstar.co.uk/uk/news/213156/6-dividend-stocks-that-are-sustainable-twice-over.aspx
[37] EIRIS Foundation Responsible Investment in Charity Pooled Funds, EIRISFOUNDATION.ORG
https://eirisfoundation.org/wp-content/uploads/2021/02/Charity-Pooled-Funds-Report.pdf
[38] IMPAX FUNDS SERIES TRUST I, SEC FORM N-CSR,
sec.gov/Archives/edgar/data/76721/000139834423005557/fp0081582-3_ncsr.htm
[39] Responsible investing and Active Ownership Report 2023, AORIS, 6510f99a81721fb709dbac55_Aoris_ESG and Active Ownership Report_2023_150.pdf

seeks investments that "enable system-or economy-wide reductions in carbon emissions." The funds exclude companies that have breached one or more 'global norms' causing environmental or social harm, such as those in the UNGC principles, the OECD Guidelines and the UNGP, or that lack "processes and compliance mechanisms to monitor compliance with UN Global Compact principles and OECD Guidelines for Multinational Enterprises."[40]

### *Kip Lyall Is a Whistleblower Who Stood up to Elsevier and RELX's Greenwashing*

60.     Plaintiff was an employee at Defendants' company Cell Press from 2014 until he was terminated in 2023.

61.     When Plaintiff joined Elsevier, he initially believed that the company was responsive to concerns about environmental human rights.

62.     In late 2020, when the American Society was fighting the crisis of COVID-19 and the Black Lives Matter movement allowed public citizens to reflect on their roles in being responsible for upholding core human rights values, Mr. Lyall, who had recently been promoted to a managerial position at the Defendants' company also felt compelled to be responsible in his sphere of work and life. Hence, Mr. Lyall decided to support the work of Cell Press's Corporate Social Responsibility work by offering solutions to better meet the CSR goals. Mr. Lyall believed in Defendants' CSR goals and statements and believed that more can be fulfilled by advocating as an employee and as a public citizen.

63.     In line with these beliefs, as of March 2021, Plaintiff purchased and owned shares of RELX (in addition to shares of RELX he owned through other investment fund portfolios since 2013). He believed that by taking ownership over his work and shares of the company, he can contribute more to seeking solutions so that Defendants can be a positive force behind

---

[40] Schroder International Selection Fund, Audited Annual Report, SCHRODERS (31 Dec 2023), api.schroders.com/document-store/SISF-AR-CHEN.pdf

environmental human rights based on the public-facing statements that the Defendants made. He was unaware of the full scope of misrepresentations that Defendants were making and the scope of their greenwashing practices at the time.

64.    Throughout his research in early 2021, Plaintiff found out shocking truths about Defendants' business practices: that they were actively and practically in support of companies that exist to profit from the expansion of fossil fuel which is omitted from their climate and sustainability-related statements.

65.    In April 2021, Plaintiff felt compelled to submit an Ethics Complaint to report his findings and concerns about Defendants' support for fossil fuel expansion and its harm to the environment. Plaintiff believed that the Ethics Complaint would be an effective way to advocate for change, because he relied upon RELX's Code of Ethics Policy which stated:

> We prohibit any attempt to defraud a customer, . . . shareholder, employee, . . . All Reports All reports and written or oral statements about our business must be accurate and not misleading. Any effort to engage in financial impropriety including making intentionally or recklessly false or misleading oral or written statements or omissions about our products, services, sales, financial condition or otherwise make false or misleading oral or written statements about our policies, security, privacy, or compliance practices is prohibited.[41]

66.    Soon after submitting the Ethics Complaint, Plaintiff founded the RGRC, an internal employee group composed of Cell Press employees as well as employees from other publishers under Elsevier and RELX.

67.    The RGRC consists of Elsevier and RELX employees concerned about the climate impacts of the company and advocated that the Defendants align their business practices with their ESG pledges.

---

[41] *Code of Ethics and Business Conduct*, RELX (2021), https://www.relx.com/~/media/Files/R/RELX-Group/documents/investors/corporate-governance/code-of-ethics/code-of-ethics-english.pdf.

68.     The RGRC authored the RGRs (see above ¶¶ 49-51), which called out the Company's misalignment with its sustainability statements and urged the company to change its practices to comply with its own sustainability policies.

69.     Although the RGRC and its RGRs represent the view of dozens of other employees who participated in the reports' development, leadership at Elsevier and RELX continuously singled out and isolated Mr. Lyall, creating a work environment that made Mr. Lyall feel unsafe and intimidated.

70.     On April 28, 2021, Mr. Lyall sent the Spring 2021 RGR (Exhibit B) via email to the Senior Human Resources Generalist at Elsevier and included an ethics complaint, informing HR that Elsevier's actions to accelerate fossil fuel discoveries "fall well short of or contradict various statements, commitments, and policies that the company has in place – particularly ones that pertain to the environment and human rights."

71.     In a response email sent on July 14, 2021, the Managing Director and Senior Vice President of Cell Press and *The Lancet* (hereinafter "MD/SVP"), both owned or published by Elsevier, wrote to Mr. Lyall, stating:

> I'd like to respectfully request that going forward you refrain from using, reproducing or sharing any Elsevier/RELX owned (copyrighted) content, except gold open access (which is publicly available); data and any other Elsevier/RELX IP without requesting prior permission from us and in any format.

72.     Upon information and belief, the Spring 2021 RGR included information that could be accessed by all employee-recipients for which they had permission to view, and the contents of the RGR and Updates contained analyses and opinions that RGRC had generated. Hence, it was clear that the email was allegedly a disguised threat to Mr. Lyall and other employees to suppress their advocacy related to Defendants' greenwashing.

73.    Subsequently, in Fall 2021, Mr. Lyall reached out to a Human Resources representative to follow up about the ethics complaint he submitted in his email on April 28, 2021, in which he addressed the greenwashing (¶ 51). The representative stated that HR was unaware of any investigation regarding his ethics complaint.

74.    Mr. Lyall then reached out to the Chief Ethics Officer at Elsevier who dismissed Plaintiff's concern by stating that there had been an investigation, and that Elsevier had not been found to have violated any of its ethical codes.

75.    Upon information and belief, the investigation that Elsevier claimed to have done was not through an independent third-party, which is required of ethics complaints. Hence, it was only a sham investigation to dismiss and suppress Mr. Lyall and other employees' advocacy about Defendants' failure to implement their climate pledge and sustainability statement in practice.

76.    On September 22, 2021, the RGRC, submitted a Fall 2021 edition of the RGR to Cell Press senior managers and other leaders outlining thoroughly researched harms to the climate coming from Defendants' business activities and misrepresentations about its climate pledge and sustainability policies.

77.    Upon allegation, not only did Defendants dismiss their stakeholders' concerns about the misrepresentations amounting to greenwashing, upon information and belief, Defendants concealed and intentionally did not provide evidence and information that was requested of them.

78.    Throughout years 2021 until his termination, Plaintiff repeatedly followed up with his ethics complaint and requested evidence about the Defendants' compliance status, requested to gain access to findings from the purported investigation of his ethics complaint, sought

substantiation about Defendants' adherence to climate-protection statements, sought records regarding Defendants' collaborations and partnership with fossil fuel companies and their purported "transitions." Such requests were repeatedly denied and ignored. As a result of the Defendants' withholding important information Plaintiff was hindered from bringing legal action at an earlier stage.

***Defendants Dismissed the Concerns of Kip Lyall and Other Employees and Retaliated Against the Plaintiff Using Isolation and Intimidation Tactics***

79.    On February 24, 2022, The Guardian published an article titled, "Revealed: Leading Climate Research Publisher Helps Fuel Oil and Gas Drilling," detailing Defendants' ties to the fossil fuel industry, including Elsevier's consultancy services and Geofacets tool, which "combines thousands of maps and studies to make it easier to find and access oil and gas reserves."[42]

80.    Mr. Lyall provided *The Guardian* with information for the aforementioned article as an anonymous source.[43]

81.    While Mr. Lyall remained as an anonymous source, upon information and belief, the Defendants' VP of Publishing Operations and leadership suspected his contribution and began aggressive retaliation tactics and pressured him to leave his job. Upon information that he obtained later in March 2023, Mr. Lyall was told by the VP of Publishing Operations that everyone else at the company suspects Mr. Lyall leaked information about Defendants' practices to The Guardian. The VP added in the same conversation: "yes, but the company keeps lying about this. That may be true. . . You might work at a company where you're never going to think they're doing the right thing. And then it's a question of is this a place you really want to work?"

---

[42] Westervelt, *supra* note 4.
[43] *Id.*

82.     In May 2022, the Defendants' MD/SVP emailed members of the RGRC stating that Elsevier and RELX leadership already engaged with Mr. Lyall on the concerns being raised and urged RGRC members to disengage from the group. The MD/SVP's communication with members of the RGRC called into question Mr. Lyall's credibility. This communication also attempted to isolate Mr. Lyall from the group and pressure the employees to stop their advocacy efforts.

83.     On May 9, 2022, Mr. Lyall recalled having a meeting with the MD/SVP and the Managing Director for Science, Technical, and Medical Journals at Elsevier (hereinafter "MD for STM Journals"). The MD/SVP falsely accused Mr. Lyall of involving coworkers in the RGRC against their will, saying Mr. Lyall is making RGRC members "feel very psychologically unsafe, and very threatened and very harassed."

84.     The MD/SVP's comments were completely baseless and derogatory of Mr. Lyall, as Mr. Lyall's email communications to RGRC members include language informing recipients that they can opt out of emails and involvement at any time. Mr. Lyall also had been sensitive to remove certain coworkers from the RGRC email list when they asked to be withdrawn, often due to pressures from Elsevier and RELX leadership that the coworkers allegedly received. The MD/SVP's comments were also patronizing and undermining the voluntary participation and collaboration of employees who stood up to advocate for the global environmental crises.

85.     In September 2022, after the Defendants found out about the contents of the Fall 2022 RGR, the Defendants' management intervened by singling out Mr. Lyall (and not any other member of the RGRC) and calling him into a meeting. There, the MD/SVP called Mr. Lyall's efforts disingenuous and further engaged in harassing, intimidating, and isolating Mr. Lyall such that the RGR could not be published.

***Plaintiff Suffered Mental Harm Due to Defendants' Harassment When He Requested Accommodations, Defendants Retaliated Against Him***

86.     On September 13, 2022, Mr. Lyall reached out to a mental health professional via email to request recommendations for a therapist, stating "[his] difficulties stem entirely from an employment situation which has grown more troubling."

87.     On October 14, 2022, Mr. Lyall reached out to a mental health professional via email for "assistance with work-related stress and anxiety."

88.     On or around October 26, 2022, Mr. Lyall reported new ethics concerns to Elsevier's Compliance and Ethics department, stating the company maintained "a psychologically uneasy work environment" because (a) it declined to communicate its retaliation policy; (b) management's use of intimidation tactics; (c) attacks on Mr. Lyall's honesty and integrity; (d) Mr. Lyall's manager informing him that she "can't protect [him] forever"; and (e) leaders at the company isolating Mr. Lyall.

89.     In response to Mr. Lyall's expressed concerns about his psychological safety in the workplace, including harassment and intimidation tactics from Defendants' leadership, the Ethics Department dismissed the concerns on the false grounds that they had already been addressed.

90.     On November 22, 2022, Mr. Lyall emailed the Global Director of Sustainability at Elsevier (hereinafter "Sustainability Director") to share the Fall 2022 RGR and ask if the company plans to withdraw from its Race to Zero pledge given that both Elsevier and RELX have taken actions that indicate no intention to honor its pledge. The Race to Zero contained the Climate Pledge, which requires pledge members to not facilitate fossil fuel expansion after June 2023.

91.     In interactions between November 23 and 28, 2022, the Sustainability Director

responded to Mr. Lyall's email by dismissing and delegitimizing the concerns raised by Mr. Lyall.

92.     When Mr. Lyall asked for clarification regarding Elsevier's harassment and retaliation policy, the company did not provide one to him.

93.     On November 8, 2022, Mr. Lyall met with a counselor through a company-sponsored program and discussed his mental health decline due to the actions of Defendants.

94.     By the end of 2022, the RGRC was forbidden from using their company emails and credentials on any of the group's publications, including the RGRs, and contacting outside parties using company email addresses or sharing materials with coworkers related to the RGRC's reports without consent from the recipients.

95.     In January 2023, Mr. Lyall received a disciplinary action on Workday, an employee management software for being "argumentative" with Elsevier leadership. At no point in time during his performance had Mr. Lyall received any negative feedback regarding his regular job performance.

96.     Mr. Lyall sought explanations, but Defendants failed to explain the basis for the adverse action.

97.     Mr. Lyall believed that the disciplinary action's basis was solely a retaliatory action for his leadership in the RGRC. Prior to the written warning, he had been told by his manager, the VP of Publishing Operation, that he needs to "try to think about what's palatable for the company" and that leadership isn't going to admit "certain things are out of alignment." Then again, in March 6, 2023, his manager told him in a meeting regarding the written warning, "Not everybody you engage with is going to be as authentic as you want them to be."

Mr. Lyall reached out to a Cell Press Senior Manager who was organizing an anti-bullying

initiative explaining the Defendants' hostile actions and that "the only 'solution' that's been offered is the suggestion that I may want to reconsider working here."

98.     Upon information and belief, this disciplinary action laid the groundwork for Mr. Lyall's later wrongful termination.

99.     On March 29, 2023, Mr. Lyall sought psychotherapy to address the stress and anxiety stemming from his employment.

100.    On March 24, 2023, Mr. Lyall emailed HR to voice his concern about the lack of follow up on "psychological safety concerns of employees from fear of retaliation," including his experience being singled out by company leadership. His concerns were ignored by Defendants.

101.    Mr. Lyall sent another follow-up email to HR regarding the lack of acknowledgement about the harm he suffered as a result of the hostile and intimidating work environment on April 25, 2024. Mr. Lyall never received a reply.

102.    On May 3, 2023, Mr. Lyall sent a Retaliatory Management Practices testimonial document to Employee Relations, providing a timeline of events and detailing his perspective of the communications, meetings, and interactions he had at Elsevier from 2021 to 2023 where he felt the management was pressuring him due to his involvement with the RGRC.

103.    On May 30, 2023, Mr. Lyall emailed the VP of Publishing Operations requesting mental health accommodations prescribed by his psychotherapist, that set forth the length and prior notification for all meetings going forward.

104.    The VP of Publishing Operations replied to Mr. Lyall, telling him she would share his accommodation request with HR.

105.    A few days after Mr. Lyall requested the accommodations meeting boundaries, Cell Press management set a one-on-one meeting with Mr. Lyall on June 7, 2023 which appeared

to be an ordinary business meeting. He was given no pre-notification about the nature or participants of the meeting aside from his manager.

106.    When Mr. Lyall signed into the meeting on June 7, 2023, the individuals who hand engaged in harassing and retaliatory practices were present, specifically the MD/SVP. At the meeting, Plaintiff was notified of his termination of employment.

107.    Simultaneously, Mr. Lyall requested a medical leave of absence via the Paid Family Medical Leave Act (hereinafter "PFMLA") due to the work environment and harassment from management exacerbating his anxiety.

108.    That same evening, Mr. Lyall received a termination letter from the US Employee Relations Lead at RELX.

109.    On August 8, 2023, Mr. Lyall was terminated upon the expiration of his PFMLA leave.

110.    On January 23, 2024 and on July 11, 2024, Defendants continued to pressure Plaintiff by sending letters containing legal threats and demanding that Plaintiff cease publishing his opinions regarding Defendants' greenwashing conduct.

***Prominent Scientists Point to Elsevier and RELX's Misalignment with Respect to Its Business Practices and Climate-related Policies***

111.    Defendants' business practices have been heavily criticized by prominent scientists who too agreed that Defendants' policies and marketing are deceptive and misaligned with their representations.

112.    Dr. Duncan Watson-Parris, an atmospheric physicist affiliated with the University of Oxford has stated,

> As presented here, it seems the Company is not 'ensuring the content, products, and data insights it generates are serving an energy transition' as claimed. Providing insight and knowledge on

new fossil fuel extraction undermines their claim to be behaving consistently with a 1.5 degree pathway. The science is pretty clear that to meet such a target we must rapidly decarbonize and no new fossil fuel extraction can take place.

Exhibit F (emphasis added).

113. Dr. Elia Valentini, a senior lecturer at the University of Essex, stated,

It appears Elsevier is failing to account for their responsibility in measuring the impact of their business activity. Elsevier's communications in the context of the climate emergency is a good example of greenwashing for they have demonstrated complicity with the destructive extractivist system over time.

Exhibit F (emphasis added).

114. Dr. Peter Kalmus, a NASA climate scientist and winner of the NASA Early

Achievement Medal and three Jet Propulsion Laboratory Voyager Awards, stated,

The science is clear. Based on scenarios created by the IPCC or IEA, upon which the Race to Zero campaign is based, there can be no new oil and gas fields or coal projects for the world to reach even the goal of global net zero by mid-century, which is not ambitious enough. Yet Elsevier/RELX continues to support the goals of the fossil fuel industry, which are antithetical to a livable planet. For Elsevier to claim that it's being guided by science, therefore, undermines the hard work of the actual scientists as we struggle to communicate the dire nature of the climate emergency and compel action. If Elsevier's pledge is real, then it will have to go well beyond simply rebranding Elsevier's 'R&D solutions for oil and gas' as 'R&D solutions for a sustainable world,' and sever all ties with the fossil fuel industry.

Exhibit F (emphasis added).

115. Dr. Katherine Hayhoe, an atmospheric scientist at Texas Tech University and

winner of the American Geophysical Union's Climate Communication Prize and the National

Center for Science Education's Friend of the Planet award, stated, "Academic publishers who

run journals that publish climate research while supporting the expansion of fossil fuel

extraction. Do they read what they publish?" Exhibit F.

## CLASS ACTION ALLEGATIONS

116.    Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

117.    Pursuant to Fed. R. Civ. P. § 23(a) and (b)(3) Plaintiffs brings this action on behalf of herself, and all others similarly situated, as representative of the following class (the "Class"):

    a.    All purchasers of RELX common stock during the class period ("class") excluding the Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

    b.    The Class Period is 5 years prior to the filing date of this complaint.

118.    The requirements of Fed. R. Civ. P. § 23 are met in this case.

119.    The Class, as defined, is so numerous that joinder of all members is impracticable. Throughout the Class Period, RELX stock was actively traded on the NYSE. Although discovery will be necessary to establish the exact size of the class, it is likely, based on the nature of Defendants' business, that class members number in the hundreds of thousands.

120.    There are questions of fact and law common to the Class as defined, which common question predominate over any questions affecting only individual members. The common questions include:

    a.    Whether the Exchange Act as Violated by Defendants as alleged herein;

    b.    Whether statements made by Defendants misrepresented material facts about the business, operations, and management of RELX and Defendants as it relates to their ESG representations;

    c.    The extent of damages that Class members have sustained and the proper measure of damages

121.    Plaintiff can and will fairly and adequate represent and protect the interests of the Class, as defined, and have no interests that conflict with the interests of the Class because:

    a.  All of the questions of law and fact regarding the liability of the Defendants are common to the class and predominate over any individual issues that may exist, such that by prevailing on her own claims, Plaintiffs will necessarily establish the liability of the Defendants to all class members;

    b.  Without the representation provided by Plaintiffs, it is unlikely that any class members would receive legal representation to obtain the remedies specific by relevant statutes and the common law;

    c.  Plaintiffs has retained competent attorneys who are experienced in the conduct of class actions. Plaintiffs and their counsel have the necessary resources to adequately and vigorously litigate this class action, and Plaintiffs and their counsel are aware of their fiduciary responsibility to the class members and are determined to diligently discharge those duties to obtain the best possible recovery for the Class.

122.    Defendants' actions have affected numerous consumers in a similar way. The class action is superior to any other method for remedying Defendants' actions given that common questions of fact and law predominate. Class treatment is likewise indicated to ensure optimal compensation for the Class and limiting the expense and judicial resources associated with thousands of potential claims.

## CAUSES OF ACTION

### COUNT I:
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### by Plaintiff Kip Lyall Individually Against All Defendants

123.    Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

124.    At all times relevant hereto, Plaintiff had a "disability" as defined by the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12102(2) as amended.

125.    At all times relevant hereto, Plaintiff was a "qualified individual with a disability" within the meaning of ADA. 42 U.S.C. § 12111(8).

126.    Through the conduct alleged above, Defendants discriminated and retaliated against Plaintiff by failing to provide accommodations and engaging in retaliation in violation of the ADA. 42 U.S.C. §§ 12112; 12203.

127.    As a direct and proximate result, Plaintiff suffered and continues to suffer damages including but not limited to loss of compensation and benefits and emotional distress damages.

128.    Plaintiff seeks compensatory damages, punitive damages, attorney's fees, and costs, and any other relief that this Court and jury finds appropriate.

129.    Plaintiff reserves the right to supplement these factual allegations after discovery.

<strong>COUNT II:<br>VIOLATION OF THE FAIR EMPLOYMENT PRACTICES ACT (M.G.L. c. 151B)<br>by Plaintiff Kip Lyall Individually Against All Defendants</strong>

130.    Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

131.    Plaintiff timely met the administrative prerequisites to suit under M.G.L. c. 151B.

132.    M.G.L. c. 151B § 4 prohibits discrimination the basis of disability, a record of disability or perceived disability, in hiring, promotion, discharge, compensation, benefits, training, classification and other aspects of employment. Disability discrimination may include failing to reasonably accommodate an otherwise qualified person with a disability.

133.    M.G.L. c. 151B prohibits employers from retaliating and subjecting employees to hostile work environment.

134.    At all relevant times, Plaintiff had a disability and was a qualified person within

the meaning of M.G.L. c. 151B § 1(15) and 1(16).

135.    Through the conduct alleged above, Defendants discriminated and retaliated against Plaintiff by failing to provide accommodations and engaging in retaliation in violation of the M.G.L. c. 151B.

136.    As a direct and proximate result, Plaintiff suffered and continues to suffer damages including but not limited to loss of compensation and benefits and emotional distress damages.

137.    Plaintiff seeks compensatory damages, punitive damages, attorney's fees, and costs, and any other relief that this Court and jury finds appropriate.

138.    Plaintiff reserves the right to supplement these factual allegations after discovery.

**COUNT III:**
**WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY**
**by Plaintiff Kip Lyall Individually Against All Defendants**

139.    Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

140.    Under Massachusetts common law, an employer may lawfully terminate a relationship with an at-will employee at any time—for any reason, for no reason, and even for a reason that might be seen by some as unwise or unkind.

141.    A limited exception to this general rule exists when employment is terminated contrary to a clearly established public policy. Under the narrow exception, redress is available for employees who are terminated for asserting a legally guaranteed right.

142.    Beyond these recognized categories, the public policy exception may extend in some "exceptional cases" to employees "terminated for performing important public deeds, even though the law does not absolutely require performance of such a deed." *Flesner v. Tech.*

*Commc'ns Corp.*, 410 Mass. 805, 811, 575 N.E.2d 1107 (1991).

143.    Plaintiff was unlawfully terminated by Defendants for refusing to conform to the Defendants' business practices which allegedly amounted to securities fraud and consumer fraud.

144.    As a direct and proximate result, Plaintiff suffered and continues to suffer damages including but not limited to loss of compensation and benefits and emotional distress damages.

145.    Plaintiff seeks compensatory damages, punitive damages, attorney's fees, and costs, and any other relief that this Court and jury finds appropriate.

146.    Plaintiff reserves the right to supplement these factual allegations after discovery.

## CLAIM IV:
### VIOLATIONS OF THE SECURITIES EXCHANGE ACT
### SECTION 10(b) (15 U.S.C. § 78j) AND RULE 10b-5 (17 CFR 240.10b-5)
### by Plaintiff by Plaintiff Kip Lyall Individually and On Behalf of Class Against All Defendants

147.    Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

148.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of RELX stock during Class Period. *See* 15 U.S.C. § 78j; 17 C.F.R. 240.10b-5.

149.    Under 28 U.S.C. § 1658(b), a plaintiff's ability to bring claims under Section 10(b) of the Exchange Act faces two temporal limitations, both of which must be satisfied: (a)

claims must be brought within two years of "discovery of the facts constituting the violation" and (b) not more than five years after the alleged violation.

150.    As alleged in paragraph 66 and in previous sections, although Mr. Lyall made multiple requests for Defendants' policies with respect to ethics and conduct, Defendants continuously ignored and dismissed his requests, delaying Mr. Lyall's ability to understand the rights and protections afforded to him in the workplace. Accordingly, equitable tolling applies to this claim because Defendants effectively prevented Mr. Lyall from bringing suit at an earlier date.

151.    During the Class Period, Defendants disseminated or approved the false statements specified above. Defendants knew or deliberately disregarded that the statements were misleading. Defendants further failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

152.    Plaintiff and the Class have suffered damages in that, they paid artificially inflated prices for RELX stock, under the belief that RELX is a company that performs well on ESG and thus better positioned for long term risk and ethically sound investment. Plaintiff and the Class would not have purchased RELX stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements regarding their ESG compliance.

153.    Plaintiff and the class rely upon the presumption of reliance established by the fraud on the market theory.

154.    Plaintiff and Class seeks compensatory damages in favor of plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon.

155.    Plaintiff and Class seeks reasonable costs and expenses incurred in this action, including counsel fees and expert fees, and all other forms of relief that this Court finds appropriate.

156.    Plaintiff reserves the right to supplement these factual allegations after discovery.

**CLAIM V:**
**PROMISSORY ESTOPPEL**
**by Plaintiff Kip Lyall Individually Against All Defendants**

157.    Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

158.    During his employment, the Defendants had in place various written policies that were intended to promote environmental sustainability, and Defendants had procedures to protect employees who submit ethics complaints and investigate the complaints. The Defendants also had in place written policies regarding the prevention of harassment at the workplace.

159.    The Plaintiff relied on and materially and adequately performed his duties and advocacy within the workplace.

160.    Defendants breached their promises to the Plaintiff and instead retaliated against him for going through the written policies, resulting in his termination.

161.    As a direct and proximate cause of the Defendants' breach of its promises and promissory estoppel, the Plaintiff has suffered irreparable harm, and seeks general, special and consequential damages, including but not limited to, compensation, prospective business relationships, reputational harm, injuries, damages, and emotional distress.

162.    Plaintiff reserves the right to supplement these factual allegations after discovery.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully requests that this Court grant the following relief:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court including but not limited to:

      a.   ordering Defendants to rectify their misrepresentations to the public;

      b.   enjoining Defendants from trading in the stock market until their misrepresentations are found to be cured by a third-party monitor.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for all issues a jury may properly decide and for all of the requested relief that a jury may award.

Dated: January 6, 2025                                   Respectfully submitted,

**Juyoun Han (pro hac vice)**
**Eric Baum (pro hac vice forthcoming)**

**EISENBERG & BAUM, LLP**
24 Union Square East, PH
New York, NY 10003
(212) 353-8700
jhan@eandblaw.com
***Attorneys for Plaintiff***