### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

———————————————————————— )
KIP LYALL, on behalf of himself )
and all others similarly situated, )
                           )
          Plaintiff, )
                           )
v.                           )
                           )      Civil Action
ELSEVIER INC, RELX PLC, and CELL )      No. 24-cv-12022-PBS
PRESS INC,                   )
                           )
          Defendants. )
———————————————————————— )

### MEMORANDUM AND ORDER

October 17, 2025

Saris, J.

### INTRODUCTION

Plaintiff Kip Lyall worked at Defendant Cell Press Inc. ("Cell Press"), a publisher of scientific journals, for almost a decade. Starting in 2021, Lyall raised concerns internally about what he viewed as "greenwashing" by Cell Press and its parent companies, Defendants Elsevier Inc. ("Elsevier") and RELX PLC ("RELX"). In particular, Lyall believed that some of Defendants' business practices conflicted with RELX's public pledges to reduce carbon emissions and fight climate change. Defendants pushed back against Lyall's criticisms, leading him to seek mental health treatment. After Lyall sought accommodations at work for his mental health conditions, Defendants terminated his employment.

1

Lyall subsequently brought this action against Defendants alleging 1) securities fraud under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5; 2) disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and Massachusetts General Laws Chapter 151B ("Chapter 151B"); 3) wrongful discharge in violation of public policy; and 4) promissory estoppel. Defendants now move to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Defendants argue that Lyall's claims of disability discrimination should be dismissed because he failed to file a timely charge with the Massachusetts Commission Against Discrimination ("MCAD") and that his other claims do not allege a plausible entitlement to relief.

After hearing, the Court **ALLOWS** Defendants' motion to dismiss (Dkt. 49).

**BACKGROUND**

The Court draws the following background from the well-pleaded facts in Lyall's second amended complaint and documents attached thereto. See Thornton v. Ipsen Biopharmaceuticals, Inc., 126 F.4th 76, 78 (1st Cir. 2025).

2

## I.   **Parties**

Lyall, a resident of Massachusetts, worked as an illustration and design program manager at Cell Press from 2014 to 2023. Cell Press publishes over fifty scientific journals and has its principal place of business in Cambridge, Massachusetts. Cell Press is a subsidiary of Elsevier, a Dutch academic publishing company. Elsevier is a subsidiary of RELX, a British multinational information and analytics company. RELX's shares are publicly traded.

## II.  **RELX's Climate-Related Statements**

RELX made a number of public climate-related pledges starting no later than 2021. That year, RELX signed the Climate Pledge and committed to the United Nations ("UN") Net Zero and Race to Zero. The Climate Pledge is a commitment to reduce climate impact enough to hold global warming to 1.5°C and to support global efforts to achieve net zero carbon emissions. A UN group has explained that private entities that commit to net zero should not "continu[e] to build or invest in new fossil fuel supply" or "lobby to undermine ambitious government climate policies." Dkt. 45 ¶ 41 (emphasis omitted).

In its 2022 annual report, RELX stated that it had signed the UN Global Compact ("UNGC"), which includes various environmental principles. The report also specified that the company would "work to further UNGC principles within RELX and in [its] supply chain."

Id. ¶ 46. According to the UNGC, adherence to the compact requires a commitment to using only renewable energy and divesting from fossil fuels.

RELX's 2022 annual report also described sustainability-related efforts undertaken by Elsevier in particular. The report explained that Elsevier "launched a free report titled Pathways to Net Zero" and that its "books team further implemented its Energy with Purpose mission statement to only commission new content that advances the energy transition and reduction of [carbon dioxide] emissions." Id. ¶ 12. RELX added that Elsevier "made the decision to close one hydrocarbon journal and transition remaining titles with updated aims and scope . . . explicitly calling for research related to" clean energy. Id. (alteration in original). Finally, the report stated that "Elsevier's Geofacets, which provides geological and geophysical data to academic and corporate customers, only added new content, features and functionality that support the energy transition" and that Geofacets' "remaining use cases focused on discovering efficiencies in established energy projects rather than new fossil fuel exploration." Id. ¶ 12 & n.8.

Lyall alleges that these pledges and public statements were "greenwashing" and that Defendants continued to engage in business activities inconsistent with achieving their professed climate-related goals. For example, the RELX Inc. Political Action Committee has contributed to American politicians who "deny

climate change." Id. ¶ 11. Defendants host exhibitions related to fossil fuel production and work with companies that have been prosecuted for environmental harm. Defendants provide data services used by fossil fuel companies. And Elsevier publishes scientific and technological journals on petroleum exploration and production, including nine of the top twenty such journals as of 2023 and 2024. Lyall alleges that Defendants misrepresented their commitment to climate policies in order to attract investors who rely on environmental criteria and to secure the inclusion of RELX stock in climate-related investment funds.

In September 2023, over 380 scientists released a petition calling on RELX and Elsevier to cease a number of these business activities. A leading sustainability scientist also publicly criticized RELX for assisting the fossil fuel industry while simultaneously publishing research demonstrating the need for climate action.

### III. **Lyall's Advocacy on Climate Issues**

On March 8, 2021, Lyall purchased shares in RELX so that he had an avenue beyond his employment to push the company to improve its record on corporate social responsibility.[1] Around the same time, he came to believe that Defendants' business activities supported fossil fuel companies and were therefore inconsistent

---

[1] Lyall also purchased shares in mutual funds that included RELX stock in June 2013, November 2014, 2018, and August 2021.

5

with their climate and sustainability pledges. Lyall submitted an internal ethics complaint on this subject in April 2021 claiming that the company was making "false or misleading" statements about its climate pledges. Id. ¶ 65.

Soon thereafter, Lyall founded the Responsible Growth Report Committee ("RGRC"), a group of RELX, Elsevier, and Cell Press employees concerned about the companies' climate impact. The RGRC circulated a series of internal reports between April 2021 and April 2023. In these reports, the RGRC pointed out business practices that the group believed did not align with the companies' climate-related policies, marketing, and public statements.

Lyall sent the RGRC's spring 2021 report and his ethics complaint to an Elsevier human resources ("HR") employee on April 28, 2021. About three months later, a managing director at Cell Press wrote to Lyall requesting that he stop using or sharing Elsevier or RELX-owned content and data without prior permission (an apparent reference to the RGRC report). That fall, Lyall reached out to Elsevier's chief ethics officer about his ethics complaint. The officer responded that an investigation into the complaint had found no ethical violation by the company. From this point until his termination, Lyall repeatedly sought information about Defendants' compliance with their climate commitments, their partnerships with fossil fuel companies, and the findings from the ethics investigation. These requests were all denied or ignored.

6

Lyall continued his advocacy in 2022 by circulating additional RGRC reports and serving as an anonymous source for a newspaper article about the fossil fuel industry's use of Defendants' services and products. Lyall was told by an executive that company leadership believed he had leaked information for the article. The Cell Press managing director criticized Lyall's advocacy during multiple meetings in 2022, telling Lyall he was making other RGRC members "feel very psychologically unsafe, and very threatened and very harassed." Id. ¶ 83. Lyall complained to Elsevier's compliance and ethics department that the company's leadership was intimidating and isolating him and had created a "psychologically uneasy work environment." Id. ¶ 88. Elsevier dismissed Lyall's concerns. Near the end of 2022, Defendants barred RGRC members from listing their company emails or credentials on their reports, contacting outside parties using their company emails, and sharing their reports with colleagues without their consent.

In January 2023, Lyall received a written disciplinary warning for being argumentative with Elsevier leadership. The company provided no official explanation for the discipline, but Lyall's manager later indicated it had to do with his climate advocacy.

IV.  **<u>Lyall's Mental Health Treatment and Termination</u>**

While these events were unfolding, Lyall sought mental health treatment for stress and anxiety related to his employment. He met with a counselor through a company-sponsored program in November 2022 and began seeing a psychotherapist in March 2023. His psychotherapist diagnosed him with "adjustment disorder with anxiety," <u>id.</u> ¶ 24, and recommended he seek accommodations regarding work meetings, including notice of at least one business day and a limit of forty-five minutes per meeting.

On May 30, 2023, Lyall requested these accommodations from his manager, who said she would share his request with HR. A few days later, Cell Press management set up a virtual meeting with Lyall for June 7 but did not tell him what the meeting was about. When Lyall signed into the meeting, the managing director who Lyall believed was harassing him was present. Lyall signed out of the meeting and submitted a request for medical leave. That evening, Lyall received a letter terminating his employment effective June 9. The next day, an HR employee emailed Lyall the following about his termination:

> If you initiate a claim [for medical leave] prior to close of business on June 9, your termination will be delayed in order for AbsenceOne to evaluate your claim. If your claim is approved, your termination date will then become effective as that benefit ceases. If you do not initiate a claim by close of business on June 9, that will be your termination date.

Id. ¶ 109. Lyall's request for medical leave was approved. When his leave expired on August 8, 2023, he received a letter stating that his termination was effective that day.

On January 23 and July 11, 2024, Defendants sent Lyall "letters containing legal threats and demanding that [he] cease publishing his opinions regarding Defendants' greenwashing conduct." Id. ¶ 112. Lyall filed a charge of discrimination against Elsevier and Cell Press with the MCAD on either June 2 or June 3, 2024.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555 (cleaned up). This standard requires a court to "separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Kando v. R.I. State Bd. of Elections, 880 F.3d 53, 58 (1st Cir. 2018) (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). The court must then determine

whether the factual allegations permit it "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Germanowski v. Harris, 854 F.3d 68, 72 (1st Cir. 2017) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). Allegations of securities fraud must satisfy the more stringent standards applicable under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). See Zhou v. Desktop Metal, Inc., 120 F.4th 278, 287 (1st Cir. 2024).

## DISCUSSION

## I.  Securities Fraud Claim (Count IV)

The Court begins with Lyall's claim of securities fraud under section 10(b) and Rule 10b-5. A private plaintiff suing under these provisions "must adequately plead '(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.'" Shash v. Biogen, Inc., 84 F.4th 1, 11 (1st Cir. 2023) (quoting Thant v. Karyopharm Therapeutics Inc., 43 F.4th 214, 222 (1st Cir. 2022)). Defendants challenge the sufficiency of Lyall's pleading of all but the third element. The Court concludes that Lyall has not adequately pled the related elements of economic loss and loss causation and, thus, does not reach Defendants' other arguments.[2]

---

[2]  The First Circuit has not decided whether a complaint's allegations of loss causation must satisfy the particularity

The element of loss causation refers to "a causal connection between the material misrepresentation and the loss." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (2005). A plaintiff must show that his economic loss was "attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price." Bricklayers & Towel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC, 752 F.3d 82, 95 (1st Cir. 2014) (quoting In re Williams Sec. Litig., 558 F.3d 1130, 1137 (10th Cir. 2009)).

"To survive a Rule 12(b)(6) motion as to loss causation, a plaintiff must 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" Shash, 84 F.4th at 19 (quoting Dura Pharms., 544 U.S. at 347). Plaintiffs commonly plead loss causation by "(1) identifying a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop." Id. at 20 (quoting Mass. Ret. Sys. v. CVS Caremark Corp., 716 F.3d 229, 237-38 (1st Cir. 2013)).

---

standard of Rule 9(b). See Shash, 84 F.4th at 19 n.15. The Court need not answer this question here because Lyall's allegations fail even under the plausibility standard of Rule 12(b)(6).

In Dura Pharmaceuticals, the Supreme Court held that
"[n]ormally, . . . an inflated purchase price" resulting from a
misrepresentation "will not itself constitute or proximately cause
the relevant economic loss" in a fraud-on-the-market case
involving publicly traded securities. 544 U.S. at 342. After all,
"at the moment the transaction takes place, the plaintiff has
suffered no loss; the inflated purchase payment is offset by
ownership of a share that at that instant possesses equivalent
value." Id. Furthermore, the plaintiff may sell his shares before
the truth comes out and, even if he does not, the value of the
shares at the time of sale may reflect factors other than the
inflated purchase price. See id. at 342-43. Thus, a plaintiff does
not adequately plead economic loss and loss causation in a fraud-
on-the-market case if he merely alleges that he paid an
artificially inflated price for the security due to a
misrepresentation. See id. at 338, 346-47.

Lyall fails to allege a cognizable theory of loss causation.
RELX's shares are publicly traded, and Lyall states in the
complaint that he is relying on the fraud-on-the-market theory.
See Dkt. 45 ¶ 155. The complaint, however, does not allege any
drop in RELX's stock price, let alone one following a corrective
disclosure. The only allegation Lyall makes with regard to loss
causation is that he "paid artificially inflated prices for RELX
stock" and "would not have purchased RELX stock at the prices [he]

paid, or at all, if [he] had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements." Id. ¶ 154. This is the theory of loss causation that Dura Pharmaceuticals rejected in the context of publicly traded shares like RELX's. Lyall does not advance an alternative theory of loss causation or argue that Dura Pharmaceuticals' rule is inapplicable in this case. Cf. Nolfi v. Ohio Ky. Oil Corp., 675 F.3d 538, 545 (6th Cir. 2012) (declining to apply Dura Pharmaceuticals' rule on loss causation to a private sale of interests in a worthless company). Lyall's failure to adequately plead loss causation is fatal to his claim of securities fraud under section 10(b) and Rule 10b-5. See Dura Pharms., 544 U.S. at 348.

## II.  **ADA and Chapter 151B Claims (Counts I and II)**

Defendants next move to dismiss Lyall's disability discrimination claims under the ADA and Chapter 151B on the basis that Lyall failed to file a timely MCAD charge. Both Title I of the ADA and Chapter 151B require that a plaintiff file an administrative charge before bringing suit. See Thornton v. United Parcel Serv., Inc., 587 F.3d 27, 31 (1st Cir. 2009); Dunn v. Langevin, 211 N.E.3d 1059, 1062 (Mass. 2023). As relevant here, a plaintiff must file that charge "within 300 days of the alleged unlawful employment practice." Brader v. Biogen Inc., 983 F.3d 39,

60 (1st Cir. 2020). If the plaintiff fails to do so, a court cannot entertain his claim. See id.; Dunn, 211 N.E.3d at 377.

Both parties focus their arguments on whether Lyall's MCAD charge was timely to challenge his termination. Lyall appears to allege that Defendants unlawfully terminated him either because of his mental health-related disability or as retaliation for seeking accommodations for that disability. Defendants contend that the 300-day window for Lyall to file a charge challenging his termination started to run on either June 7 or June 8, 2023, when he received a termination letter and then an email clarifying that his termination date would depend on whether he initiated a claim for medical leave and when that leave ended. Lyall responds that this initial notification of his termination was equivocal and, thus, that the 300-day window did not commence until he received another termination letter at the end of his medical leave on August 8, 2023. Lyall filed his MCAD charge on either June 2 or June 3, 2024, so whether his charge was timely to challenge his termination turns on which party has correctly identified when the 300-day window started to run.

Under both federal and Massachusetts law, the statute of limitations for an employment discrimination claim commences "upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." Shervin v. Partners Healthcare Sys., Inc., 804 F.3d 23, 33 (1st Cir. 2015)

14

(quoting <u>Del. State Coll. v. Ricks</u>, 449 U.S. 250, 258 (1980));
<u>accord</u> <u>Abraham v. Woods Hole Oceanographic Inst.</u>, 553 F.3d 114,
117 (1st Cir. 2009). Thus, "an ordinary wrongful-discharge claim
accrues -- and the limitations period begins to run -- when the
employer notifies the employee he is fired, not on the last day of
his employment." <u>Green v. Brennan</u>, 578 U.S. 547, 564 (2016); <u>see</u>
<u>Abraham</u>, 553 F.3d at 117; <u>Adamczyk v. Augat, Inc.</u>, 755 N.E.2d 824,
828 (Mass. App. Ct. 2001). "Mere continuity of employment" beyond
the date of notification, "without more, is insufficient to prolong
the life of a cause of action for employment discrimination."
<u>Vélez-Vélez v. P.R. Highway & Transp. Auth.</u>, 795 F.3d 230, 236
(1st Cir. 2015) (quoting <u>Chardon v. Fernandez</u>, 454 U.S. 6, 8 (1981)
(per curiam)).

Nonetheless, only an unambiguous or unequivocal notification
of termination triggers the running of the limitations period. <u>See</u>
<u>Abraham</u>, 553 F.3d at 118 n.7; <u>Nieves-Vega v. Ortiz-Quinones</u>, 443
F.3d 134, 136-37 (1st Cir. 2006). A notification of termination is
equivocal or ambiguous if "a reasonable person would have believed
that there was a possibility that there 'might be a retreat or
change in position prior to the termination.'" <u>Svensson v. Putnam</u>
<u>Invs. LLC</u>, 558 F. Supp. 2d 136, 142 (D. Mass. 2008) (quoting
<u>Angeles-Sanchez v. Alvarado</u>, 993 F.2d 1530, at *3 (1st Cir. 1993)
(unpublished table decision)).

15

Here, as Defendants argue, the 300-day window for Lyall to file a charge relating to his termination began to run no later than June 8, 2023. The day before, Lyall submitted a request for medical leave and received a letter terminating his employment effective June 9. Whatever ambiguity may have arisen from the confluence of these two events was dispelled on June 8 when an HR employee emailed Lyall that his termination "w[ould] be delayed in order for [the benefit administrator] to evaluate [his] claim" and that he would be terminated at the latest after any approved leave expired. Dkt. 45 ¶ 109. While Lyall's final day of employment was uncertain at that point, HR unambiguously notified him that he was being terminated. No reasonable person would have understood from the communications Lyall received that there was a chance Defendants would change their minds about his termination or find an alternative position for him.

Lyall's arguments to the contrary are unconvincing. He asserts that the June 2023 termination notice was equivocal because it followed a meeting at which Defendants failed to abide by the accommodations he had requested for his mental-health issues. But whether Defendants failed to reasonably accommodate Lyall's disability has no bearing on whether they unambiguously notified him of his termination. Lyall also contends that his termination upon the expiration of his leave on August 8, 2023, was "yet another discriminatory act" and that he was terminated on that

16

date "for th[e] additional reason" that he requested and was granted leave. Dkt. 52 at 19. The facts pled in the complaint, however, make clear that Defendants decided to terminate Lyall in June 2023 and communicated as much to him at the time. Defendants carried out that decision on August 8. In other words, while "the consequences of [Lyall's termination] became most painful" on August 8, Shervin, 804 F.3d at 33 (quoting Ricks, 449 U.S. at 258), his termination claims accrued when Defendants unequivocally notified him in June 2023 that he was fired, see Green, 578 U.S. at 564. Lyall's MCAD charge, filed more than 300 days later, was therefore untimely to challenge his termination.[3]

Finally, Lyall's briefing states in passing that after his termination, Defendants "continued to retaliate against him 'by sending letters containing legal threats and demanding that [he] cease publishing his opinions regarding Defendants' greenwashing conduct'" on January 23 and July 11, 2024. Dkt. 52 at 22 (quoting Dkt. 45 ¶ 112). Insofar as Lyall means to argue that his discrimination claims are timely to challenge Defendants' sending of these letters as further retaliation for seeking accommodations for his disability, this one-sentence argument is insufficiently

---

[3] Lyall's complaint alleges that Defendants also violated the ADA and Chapter 151B by failing to reasonably accommodate his disability. His opposition to the motion to dismiss, however, does not address his failure-to-accommodate claims or argue that those claims accrued later than his claims relating to his termination.

developed and, thus, waived. See Groveland Mun. Light Dep't v. Phila. Indem. Ins. Co., 496 F. Supp. 3d 582, 586 (D. Mass. 2020) (noting that courts do "not consider any argument raised in only a perfunctory manner"); Modeski v. Summit Retail Sols., Inc., 470 F. Supp. 3d 93, 110 (D. Mass. 2020) (similar). In any event, Lyall has not pled sufficient facts to support a reasonable inference that his request for accommodations bore any causal relationship to the sending of these letters, the first of which was sent more than five months after his termination. See Pena v. Honeywell Int'l, Inc., 923 F.3d 18, 32 (1st Cir. 2019) (explaining that a claim of retaliation under the ADA requires "a causal connection between the protected conduct and the adverse employment action" (quoting Calero-Cerezo v. U.S. Dep't of Just., 355 F.3d 6, 25 (1st Cir. 2004))).

### III. <u>Wrongful Discharge and Promissory Estoppel Claims (Counts III and V)</u>

That leaves Lyall's claims for wrongful discharge in violation of public policy and promissory estoppel. The parties to this suit are not completely diverse, so the Court has only supplemental jurisdiction over these state-law claims. See 28 U.S.C. § 1367(a).

"[I]t is settled law that district courts may decline to exercise supplemental jurisdiction over pendent state law claims when the anchor federal claims for those state law claims are

dismissed." Borrás-Borrero v. Corporación del Fondo del Seguro del Estado, 958 F.3d 26, 36 (1st Cir. 2020); see 28 U.S.C. § 1367(c)(3); Cruz-Arce v. Mgmt. Admin. Servs. Corp., 19 F.4th 538, 546 n.5 (1st Cir. 2021). Indeed, in "the usual case [where] all federal-law claims are eliminated before trial," the relevant factors of "comity, judicial economy, convenience, and fairness" will counsel "toward declining to exercise jurisdiction over the remaining state-law claims." Vazquez-Velazquez v. P.R. Highways & Transp. Auth., 73 F.4th 44, 53 (1st Cir. 2023) (quoting Redondo Constr. Corp. v. Izquierdo, 662 F.3d 42, 49 (1st Cir. 2011)). Having dismissed Lyall's federal-law claims, the Court declines to exercise supplemental jurisdiction over his state-law claims for wrongful discharge in violation of public policy and promissory estoppel.[4]

## ORDER

Accordingly, Defendants' motion to dismiss (Dkt. 49) is **ALLOWED**. The Court dismisses Count I (violation of the ADA), Count II (violation of Chapter 151B), and Count IV (securities fraud) with prejudice. The Court dismisses Count III (wrongful discharge

---

[4] It is nonetheless appropriate to dismiss Lyall's Chapter 151B claim on the merits because, as discussed above, the claim is analogous in relevant respects to his federal ADA claim and the two claims fail for the same reason. See Robinson v. Town of Marshfield, 950 F.3d 21, 31-32 (1st Cir. 2020); Wilber v. Curtis, 872 F.3d 15, 23 (1st Cir. 2017).

in violation of public policy) and Count V (promissory estoppel)
without prejudice.


SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge